ANTHONY ALEXIS, DC Bar #384545
Email: anthony.alexis@cfpb.gov
JEFFREY PAUL EHRLICH, FL Bar #51561
Email: jeff.ehrlich@cfpb.gov
JOHN C. WELLS, DC Bar #491292
Email: john.wells@cfpb.gov
KARA K. MILLER, VA Bar #47821
Email: kara.miller@cfpb.gov
Telephone: (202) 435-7825
MEGHAN SHERMAN CATER, NY Bar #4473120
Email: meghan.sherman@cfpb.gov
Telephone: (202) 435-9165
LEANNE E. HARTMANN, CA Bar #264787
Email: leanne.hartmann@cfpb.gov
Telephone: (415) 844-9787
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Facsimile: (202) 435-7329
Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| Consumer Financial Protection Bureau,<br><br>　　　Plaintiff,<br><br>v.<br><br>D and D Marketing, Inc., d/b/a T3Leads, Grigor Demirchyan, and Marina Demirchyan,<br><br>　　　Defendants. | **Case No. 2:15-cv-9692**<br><br>**COMPLAINT FOR VIOLATIONS OF THE CONSUMER FINANCIAL PROTECTION ACT OF 2010** |

1

The Consumer Financial Protection Bureau (Bureau) brings this action against D and D Marketing, Inc., d/b/a T3Leads (T3); Grigor Demirchyan; and Marina Demirchyan under the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531, 5536(a), 5564, 5565, and alleges as follows.

## Introduction

1. Defendant T3 is a lead aggregator that purchases consumer information (called leads) from lead generators that market payday and installment loans. T3 then sells the leads to lenders and other lead purchasers. T3 has failed to vet or monitor its lead generators and lead purchasers, which exposed consumers to the risk of having their information purchased by illegal actors. And T3 has allowed its lead generators to attract consumers with misleading statements and has taken unreasonable advantage of consumers' lack of understanding of the material risks, costs, or conditions of the loan products for which they apply. This conduct was unfair and abusive, in violation of the CFPA, 12 U.S.C. §§ 5531, 5536(a).

## Jurisdiction and Venue

2. This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

3. Venue is proper because Defendants transact business in this district and reside in this district. 28 U.S.C. § 1391(b), (c); 12 U.S.C. § 5564(f).

**Parties**

4. The Bureau is an independent agency of the United States charged with regulating the offering and providing of consumer-financial products and services under "Federal consumer financial laws." 12 U.S.C. § 5491(a). The Bureau is authorized to initiate civil actions in federal district court, by its own attorneys, to address violations of "Federal consumer financial law." 12 U.S.C. § 5564(a)-(b).

5. D and D Marketing, Inc., d/b/a T3Leads, is a California S-Corporation with its principal place of business at 4000 West Alameda Avenue, Suite 200, Burbank, California, 91436. At all material times, T3 transacted business in this district and nationwide, selling consumer-loan applications as leads to payday and installment lenders. The lenders to which T3 sells leads are "covered persons" under the CFPA—they extend credit and service payday or installment loans for use by consumers for personal, family, or household purposes. 12 U.S.C. § 5481(15)(A)(i). T3 is therefore a "service provider" under the CFPA. 12 U.S.C. § 5481(26)(A).

6. Grigor Demirchyan is President, CEO, CFO, and T3's sole Director, provides accounting services for T3, and claims to have been an owner of T3 since

1  its founding. Grigor Demirchyan resides in this district and, in connection with the
2  matters alleged, transacted business here.
3        7.      Marina Demirchyan is Vice President of T3 and provides accounting
4  services for T3. Marina Demirchyan resides in this district and, in connection with
5  the matters alleged, transacted business here.

## Factual Background

7        8.      T3 has a network of lead generators from which it buys leads and a
8  separate network of purchasers to which it sells leads. Lead generators do not
9  know the identities of the lead purchasers in T3's network or details about the
10 terms of the credit products offered to consumers, and the lead purchasers do not
11 know the identities of the lead generators or the methods they use to attract
12 consumers.
13       9.      Lead generators operate websites that advertise loans and through
14 which consumers submit loan applications. Lead generators sell the applications to
15 T3, and T3 sells the applications to lead purchasers.
16       10.     The purchasers are online payday and installment lenders, as well as
17 data managers, data brokers, and remarketing companies. Data managers are
18 intermediaries for lenders that outsource their lead-purchasing activities, and data
19 brokers are lead aggregators that have their own networks of lead purchasers to
20 which they sell leads after they purchase them from T3. T3 does not know the end

purchasers of the leads it sells to data managers or data brokers. Remarketing companies buy consumer information to send marketing materials to consumers for products other than the loans for which consumers applied.

11. To filter leads to lead purchasers, T3 uses a "ping tree," which sets the order in which lead purchasers have the option to purchase a given lead from T3. The position of each purchaser in the ping tree is determined primarily by the price the purchaser is willing to pay for a lead; the higher the price, the better the purchaser's position in the ping tree.

12. A consumer who submits a loan application on a lead generator's webpage is immediately redirected from that page to a lender's webpage. This automated process takes just seconds, and the consumer is not informed that the loan application has been sold to T3 or sold by T3 to a lead purchaser.

13. Before T3 "on-boards" a prospective lead generator into its network, the company performs an introductory review of the lead generator's website to check for misleading or inaccurate statements to consumers. But lead generators can change their websites without any notice to T3, and T3 does not monitor those websites after lead generators are on-boarded.

14. T3 regularly purchases leads from lead generators whose websites include misrepresentations that are likely to mislead consumers into believing that lenders in T3's network have been evaluated and meet certain standards.

Case 2:15-cv-09692-PSG-E   Document 1   Filed 12/17/15   Page 6 of 13   Page ID #:6

15. Lead generators have incorrectly represented that they were themselves lenders. Lead generators also falsely suggested that they would help consumers find the best rates or lowest fees or that they would review consumers' applications to match them with appropriate lenders.

16. T3's lead generators typically do not provide loans directly to consumers, do not select the lenders that will see a consumer's application, and have no involvement in or knowledge of the terms of the loan a consumer receives after T3 sells the lead. Lead generators do nothing more than forward applications to T3.

17. T3 does not know the loan terms that consumers will be offered by its lead purchasers, and T3 makes no attempt to match consumers with the best loan for their needs, as consumers are led to believe by lead generators.

18. T3 does not require data managers or data brokers to disclose the ultimate purchasers of T3's leads. T3 therefore does not know the identity of all lenders that obtain consumer applications through its lead-purchaser network.

19. T3 does not vet or monitor the lead purchasers in its network for compliance with applicable laws.

20. In 2013, T3 requested information regarding whether its purchasers complied with the laws of the states where they made loans. Many of its purchasers failed to respond to this request, but T3 continued to do business with them.

Case 2:15-cv-09692-PSG-E   Document 1   Filed 12/17/15   Page 7 of 13   Page ID #:7

21. Lead purchasers provide regular feedback to T3 regarding the quality of its leads, including the number of leads that convert to loans and reasons why leads did not convert. T3 uses this information to refine its lead processing to optimize lead conversion.

22. Many of T3's lenders are entities organized by Indian tribes, known as tribal lenders, or organized under the laws of foreign jurisdictions, known as offshore lenders. These lenders typically claim immunity from state regulation, do not comply with the laws of the states where the consumers to which they make loans are located, and do not concede that they are subject to jurisdiction in a forum convenient to the consumer.

23. Tribal lenders and offshore lenders typically charge higher interest rates than lenders adhering to state laws. Because they charge higher interest rates, these lenders generally are willing to pay more for leads and thus rank at the top of the T3 ping tree.

24. Many of the tribal lenders among T3's purchasers offer contracts providing for the application of tribal law to the contract and providing an exclusive tribal dispute-resolution process.

25. Certain entities operating or purporting to operate in the payday or installment-loan industry have engaged in a variety of fraudulent schemes involving leads purchased from lead aggregators. T3 knew or should have known

of such fraudulent actors in the payday or installment-loan industry and the risk of illegal actors purchasing its leads.

## Count I
## Unfair Acts and Practices in Violation of the CFPA
## Against All Defendants

26. Plaintiff realleges and incorporates by reference paragraphs 1-25 of this Complaint.

27. An act or practice is unfair if it causes or is likely to cause substantial injury to consumers that is not reasonably avoidable by consumers and is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. § 5531(c)(1).

28. T3's lead generators make statements to consumers regarding the lenders that will receive the consumers' information and the loans those lenders will offer.

29. T3 knows or should know of the lead generators' statements and that they are often false and misleading.

30. T3 does not vet or monitor its lead purchasers for illegal activity.

31. T3 does not require data managers or data brokers to disclose the end purchasers of leads.

32. Consumers are not notified that T3 is involved with processing their loan applications and cannot reasonably investigate or assess the reliability of the lenders to which their applications are ultimately sold.

33. T3's conduct is likely to cause substantial injury to consumers.

34. The potential benefit of obtaining a loan is not outweighed by the likelihood of injury from T3's failure to vet and monitor its lead purchasers.

35. T3's conduct constitutes an unfair act or practice under 12 U.S.C. §§ 5531(c)(1), 5536(a)(1)(B).

36. Grigor Demirchyan knowingly or recklessly provides substantial assistance to T3, a service provider engaged in unfair acts and practices, in violation of the CFPA, 12 U.S.C. § 5536(a)(3).

37. Marina Demirchyan knowingly or recklessly provides substantial assistance to T3, a service provider engaged in unfair acts and practices, in violation of the CFPA, 12 U.S.C. § 5536(a)(3).

**Count II**
**Abusive Acts and Practices in Violation of CFPA**
**Against All Defendants**

38. Plaintiff realleges and incorporates by reference paragraphs 1-25 of this Complaint.

39. An act or practice is abusive if it "takes unreasonable advantage of . . . a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service." 12 U.S.C. § 5531(d)(2)(A).

40. Contrary to representations by lead generators, consumers are likely to be steered, through T3's ping tree, to lenders offering less-favorable terms than may otherwise be available to them. In particular, consumers are likely to be steered to lenders that charge higher interest rates than lenders that comply with state laws, that do not adhere to state usury limits, or that claim immunity from state regulation and jurisdiction. Consumers also are likely to be steered to lenders that offer contracts providing for the application of tribal law to the contract and providing an exclusive tribal dispute-resolution process.

41. The possibility of being matched by T3 with a lender that offers less-favorable terms than may otherwise be available is not disclosed to consumers by lead generators. Only after consumers are filtered through the T3 ping tree and redirected from a lead generator's page to a lender's e-signature page can consumers find the offered terms and links to lengthy disclosures where lenders reveal material terms such as their tribal affiliation and claimed immunity.

42. The inaccurate statements by T3's lead generators decrease the likelihood that consumers will read the lengthy disclosures on a lender's webpage.

43. The cost of a loan relative to what other lenders might offer, the law governing a loan contract, including whether the lender complies with laws of the consumer's state, and the available forum for raising disputes with the lender or in which the consumer might be sued by the lender are material risks, costs, or conditions.

44. T3 knows or should know of lead generators' representations to consumers. T3 knows or should know that its process results in many, if not most, leads being steered to lenders that make loans to consumers that do not comport with express or implied representations made on lead-generator websites.

45. T3's conduct takes advantage of consumers' lack of understanding of the material risks, costs, or conditions of the products for which they apply and constitutes an abusive act or practice under 12 U.S.C. §§ 5531(d)(2)(A), 5536(a)(1)(B).

46. Grigor Demirchyan knowingly or recklessly provides substantial assistance to T3, a service provider that engaged in abusive acts and practices, in violation of 12 U.S.C. § 5536(a)(3).

47. Marina Demirchyan knowingly or recklessly provides substantial assistance to T3, a service provider that engaged in abusive acts and practices, in violation of 12 U.S.C. § 5536(a)(3).

**Prayer for Relief**

Wherefore, the Plaintiff requests that the Court:

1. award injunctive relief as may be necessary to prevent consumer injury during the pendency of this action and to preserve the possibility of effective final relief;

2. permanently enjoin Defendants from committing future violations of the CFPA or any provision of "Federal consumer financial law," as defined by 12 U.S.C. § 5481(14);

3. grant additional injunctive relief as may be just and proper;

4. award damages or other monetary relief against Defendants;

5. order Defendants to pay redress to harmed consumers;

6. order disgorgement of ill-gotten revenues from Defendants;

7. impose civil money penalties against Defendants;

8. order Defendants to pay Plaintiff's costs and fees incurred in connection with prosecuting this action; and

9. award additional relief as the Court may determine to be just and proper.

Dated: December 17, 2015        Respectfully submitted,

Anthony Alexis (DC Bar #384545)
*Enforcement Director*

Jeffrey Paul Ehrlich (FL Bar #51561)
*Deputy Enforcement Director*

John C. Wells (DC Bar # 491292)
*Assistant Litigation Deputy*

/s/ Leanne E. Hartmann
Leanne E. Hartmann (CA Bar #264787)
    Email: leanne.hartmann@cfpb.gov
    Telephone: (415) 844-9787
Kara K. Miller (VA Bar #47821)
    Email: kara.miller@cfpb.gov
    Telephone: (202) 435-7825
Meghan Sherman Cater (NY Bar #4473120)
    Email: meghan.sherman@cfpb.gov
    Telephone: (202) 435-9165
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Facsimile: (202) 435-7329

*Attorneys for the Consumer Financial Protection Bureau*