KARA K. MILLER (*pro hac vice*)
Email: kara.miller@cfpb.gov
MEGHAN SHERMAN CATER (*pro hac vice*)
Email: meghan.sherman@cfpb.gov
BARRY REIFERSON (*pro hac vice*)
Email: barry.reiferson@cfpb.gov
LEANNE E. HARTMANN, CA Bar #264787
Email: leanne.hartmann@cfpb.gov
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone: (202) 435-7825
Facsimile: (202) 435-7329
KENT A. KAWAKAMI, CA Bar #149803
Email: kent.kawakami@usdoj.gov
Local Counsel
United States Attorney's Office
Central District of California – Civil Division
300 North Los Angeles Street, Room 7516
Los Angeles, CA 90012
Telephone: (213) 894-4858
Facsimile: (213) 894-2380
Attorneys for Plaintiff
Consumer Financial Protection Bureau

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| Consumer Financial Protection Bureau,<br><br>            Plaintiff,<br>v.<br><br>D and D Marketing, Inc., d/b/a T3Leads, Grigor Demirchyan, and Marina Demirchyan,<br><br>            Defendants. | Case No. 2:15-cv-9692-PSG(Ex)<br><br>AMENDED COMPLAINT FOR VIOLATIONS OF THE CONSUMER FINANCIAL PROTECTION ACT OF 2010 |

1

## Introduction

The Consumer Financial Protection Bureau (Bureau) brings this action against D and D Marketing, Inc., d/b/a T3Leads (T3), Grigor Demirchyan, and Marina Demirchyan (collectively, "Defendants") under the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531, 5536(a), 5564, 5565. Defendant T3 is a lead aggregator that sells consumer-loan applications as "leads" to small-dollar lenders and other purchasers. T3 failed to vet or monitor its lead generators and lead purchasers, exposing consumers to the risk of having their information purchased by actors who would use it for illegal purposes. T3 allowed its lead generators to attract consumers with misleading statements, and T3 took unreasonable advantage of consumers' lack of understanding of the material risks, costs, or conditions of the loan products for which they apply. T3's conduct was unfair and abusive, in violation of the CFPA, 12 U.S.C. §§ 5531, 5536(a)(1). Grigor Demirchyan and Marina Demirchyan knowingly or recklessly provided substantial assistance to T3 in its unfair and abusive acts and practices, in violation of the CFPA, 12 U.S.C. § 5536(a)(3).

## Jurisdiction and Venue

1. This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents

a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345.

2. This Court has personal jurisdiction over Defendants because the causes of action arose from the Defendants' conduct of business in this District, and the Defendants reside here. 12 U.S.C. § 5564(f).

3. Venue is proper in this District because a substantial part of the acts or omissions giving rise to the claims occurred here, and the Defendants transacted business in this district and reside in this district. 28 U.S.C. § 1391(b), (c); 12 U.S.C. § 5564(f).

**Parties**

4. The Bureau is an independent agency of the United States charged with regulating the offering and providing of consumer-financial products and services under "Federal consumer financial laws." 12 U.S.C. § 5491(a). The Bureau is authorized to initiate civil actions in federal district court, by its own attorneys, to address violations of "Federal consumer financial law." 12 U.S.C. § 5564(a)-(b).

5. D and D Marketing, Inc., d/b/a T3Leads, is a California S-Corporation with its principal place of business at 4000 West Alameda Avenue, Suite 200, Burbank, California, 91436. T3 is in the business of receiving consumer-loan

applications from lead generators and selling the applications as leads to small-dollar lenders.

6. Grigor Demirchyan is President, CEO, CFO, and T3's sole Director, provides accounting services for T3, and claims to have been an owner of T3 since its founding. Grigor Demirchyan has substantial control over and involvement in the establishment of T3's business policies and practices. Grigor Demirchyan resides in this district and, in connection with the matters alleged, transacted business here.

7. Marina Demirchyan is Vice President of T3 and provides accounting services for T3. Marina Demirchyan has substantial control over and involvement in the establishment of T3's business policies and practices. Marina Demirchyan resides in this district and, in connection with the matters alleged, transacted business here.

**Factual Background**

8. Lead generators operate websites that advertise loans and through which consumers submit loan applications. Lead generators transfer the applications to T3.

9. T3 hosts and controls certain lead-generator websites from which it receives loan applications, acting as its own lead generator in these instances.

4

10. T3 sells the loan applications it receives from lead generators and its own websites to purchasers in its network.

11. The purchasers in T3's network include online small-dollar lenders, as well as data managers, data brokers, and remarketing companies.

12. Lenders to which T3 sells loan applications extend credit in the form of small-dollar loans for use by consumers for personal, family, or household purposes, with an expectation that the principal, interest, and fees will be collected from consumers.

13. Data managers are intermediaries for lenders that outsource their lead-purchasing activities, and data brokers are lead aggregators that have their own networks of purchasers to which they sell loan applications after they purchase them from T3. T3 does not require that data managers and data brokers disclose the end purchasers of applications.

14. Remarketing companies buy consumer information to market products other than the loans for which consumers applied. T3 does not require its purchasers to provide information to T3 or to consumers about remarketing relationships they may have.

15. Since at least August 2014, Grigor Demirchyan and Marina Demirchyan have had authority and responsibility to decide whether to accept any lead generator or purchaser into or remove them from T3's network.

5

16. To filter and sell applications to purchasers, T3 uses a "ping tree," which sets the order in which purchasers have the opportunity to purchase a given application from T3. The position of each purchaser in the ping tree is determined primarily by the price the purchaser is willing to pay T3 for that application; the higher the price, the better the purchaser's position in the ping tree.

17. Since at least August 2014, Grigor Demirchyan and Marina Demirchyan have shared responsibility for deciding the position of each purchaser in the ping tree and designing T3's systems to filter and sell applications in the manner most profitable to T3, without regard for the practices of lead generators or purchasers.

18. A consumer who submits a loan application on a lead generator's webpage is immediately redirected from that page to a lender's webpage. This automated process takes just seconds, and the consumer is not informed that the loan application has been filtered through T3 or sold by T3.

19. T3 knows or has reason to believe that its lead generators' websites contain misleading or inaccurate statements. Nevertheless, T3 does not effectively monitor lead generators' websites to check for misleading or inaccurate statements.

20. In addition to the websites of its lead generators, the lead-generating websites owned and operated by T3 have contained misleading or inaccurate statements.

6

21. T3 regularly receives applications from its own websites or the websites of its lead generators that contain misleading or inaccurate statements that are likely to mislead consumers into believing that lenders to which they will be directed have been evaluated and meet certain standards. For example, lead-generating websites include statements such as, "[t]he owners of this site and our lenders comply with all state and federal regulations to short-term loans," or "Federal law (Lending Reform Act) protects you against usurious interests. We provide you with lenders who follow the rules. Their rates are reasonable."

22. T3 regularly accepts applications from its own websites or the websites of its lead generators that contain misleading or inaccurate statements that are likely to mislead consumers into believing that their application is being submitted directly to a lender by, for example, using a name that appears to be a lender, such as "BrightonLenders.com," or language suggesting the website is that of a lender, such as "Cash Now is the premier provider of online payday loans to US residents," or "www.800fastpayday.com supplies payday loans to borrowers so they can conveniently access the cash they need without the hassle and stress imposed by other lenders."

23. T3 regularly accepts applications from its own websites or the websites of its lead generators that contain misleading or inaccurate statements that have falsely suggested that the lead generator would help consumers find the best

rates or lowest fees or that it would review consumers' applications to match them with the most appropriate lenders. For example, lead-generating websites include statements such as, "you can be sure that you are getting the best rates available;" "we work to find you the best possible loan terms;" or "[o]ur system accounts for every aspect of your stated need and personal details when seeking the right fit. This helps you get the amount you need with the best possible APR and repayment terms."

24. Lead generators forward applications to T3 without regard for how the consumers' information will be used.

25. T3 does not require its purchasers to provide T3 with the precise loan terms that each consumer will be offered, and T3 makes no attempt to match consumers with the best loan for their needs, as consumers are led to believe by some of T3's or its lead generators' websites. T3 sells to purchasers based on its own financial interests, without regard for representations that have been made to and expectations of consumers.

26. T3 knows in advance of its sales the application parameters each of its purchasers will accept, and T3 knows the identity of each purchaser in its network. T3 does not vet or monitor the purchasers in its network for compliance with applicable laws.

8

27. T3 knows or has reason to believe that the applications it sells are likely to result in loans with interest rates that exceed state usury limits or otherwise fail to comply with laws of the state where the consumer is located.

28. T3 knows the consumer's state of residence for each application it sells, and T3 knows or should know that some of the applications it sells are from consumers located in states where the resulting loan will be void or the lender will have no legal right to collect the principal, interest, or fees from the consumer.

29. T3 receives applications from consumers in all U.S. states and sells applications from consumers in any state for which a purchaser requests them. T3 does not require proof that the lenders that receive its applications are permitted to make loans to consumers in each state from which they seek applications.

30. T3 does not require data managers or data brokers to disclose the ultimate purchasers of T3's applications. T3 therefore does not know the identity of all lenders that purchase consumer applications through its lead-purchaser network.

31. Many of the lenders that purchase applications through T3 are entities organized by Native American Indian tribes, known as tribal lenders, or under the laws of foreign jurisdictions, known as offshore lenders. T3 knows or should know that many of its purchasers are tribal or offshore lenders, and T3 sells applications

9

to those lenders knowing that consumers are not informed that their application may be directed to one of them.

32. Tribal and offshore lenders typically claim immunity from state regulation, do not comply with the laws of the states where the consumers to which they make loans are located, and do not concede that they are subject to jurisdiction in a forum convenient to the consumer.

33. Tribal and offshore lenders typically charge higher interest rates than do lenders adhering to state laws. These lenders rely on lead generators to find customers. They are willing to pay competitive prices for applications and regularly rank at the top of the T3 ping tree.

34. Many of the tribal lenders among T3's purchasers offer contracts providing for the application of tribal law to the contract and providing an exclusive tribal dispute-resolution process.

35. T3 has sold hundreds of thousands of loan applications to tribal or offshore lenders.

36. T3 knew or should have known that certain entities operating or purporting to operate in the small-dollar-loan industry have engaged in a variety of scams or fraudulent schemes involving applications purchased from lead aggregators, such as contacting consumers to collect non-existent debt. T3 encountered so much illicit activity that one employee referred to "the notorious

10

scams we deal with on a daily basis" in an internal e-mail message. T3 knew or should have known of the risk of purchasers using its applications for illegal purposes.

37. In 2013, T3 developed a "Lender Audit Questionnaire" and requested information regarding whether its purchasers complied with the laws of the states where they made loans. Many of its purchasers failed to respond to this request or admitted a failure to comply with state laws, but T3 continued to do business with them. T3's Lender Audit Questionnaire asked purchasers to identify ongoing investigations of their activities, but it did not request information about existing orders that may restrict the lending activity of purchasers.

38. Purchasers provide regular feedback to T3 regarding the quality of the purchased applications, including the number of applications that result in loans and reasons why applications did not result in loans. T3 uses this information to evaluate its lead generators and refine its processing to optimize the rate at which applications result in loans. This optimization is conducted for T3's benefit—to sell more applications.

39. T3 does not share the identities of its lead generators with its purchasers, and T3 does not share the identities of its purchasers with its lead generators.

11

40. T3 controls the information flow between its lead generators and its purchasers, allowing lead generators to claim ignorance of the terms of the loans offered to consumers and allowing purchasers to claim ignorance of the methods used to attract consumers.

41. T3's process allows lenders to receive applications from consumers to whom they have been prohibited from lending, and consumers have no way to know of the risk of being directed through T3 to such a lender. For example, from 2010 to 2013, Northway Financial Corporation, Ltd. was the subject of cease-and-desist orders by regulators in at least six states, and consumers from only one of those states were excluded from the applications that might be accepted from T3 by Blizzard Interactive, the purchaser acting on behalf of Northway. Similarly, on January 16, 2013, the Department of Corporations of the State of California found Joro Resources LTD, doing business as IdealGelt, to have violated the California Financial Code and ordered it to desist and refrain from originating or offering to originate deferred-deposit transactions in the state of California without first obtaining a license or otherwise being exempt; as of July 2013, T3 continued to direct applications from California consumers to Joro Resources LTD, doing business as IdealGelt, at www.IdealGelt.com.

**Count I**
**Unfair Acts and Practices in Violation of the CFPA**
**Against All Defendants**

42. Plaintiff realleges and incorporates by reference paragraphs 1-41 of this Complaint.

43. The lenders to which T3 sells applications are "covered persons" under the CFPA—they extend credit for use by consumers for personal, family, or household purposes. 12 U.S.C. § 5481(15)(A)(i).

44. T3 provides a material service to covered persons in connection with the offering or provision by the covered persons of a consumer-financial product or service. T3 is a "service provider" to covered persons under the CFPA. 12 U.S.C. § 5481(26)(A).

45. An act or practice is unfair if it causes or is likely to cause substantial injury to consumers that is not reasonably avoidable by consumers and is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. § 5531(c)(1).

46. T3 and its lead generators make statements to consumers regarding the lenders that will receive the consumers' information and the loans those lenders will offer.

47. T3 knows or should know of the lead generators' statements and that they are often false and misleading.

48. T3 does not vet or monitor its purchasers for illegal activity.

49. T3 does not require data managers or data brokers to disclose the end purchasers of applications.

50. Consumers are not notified that T3 is involved with processing their loan applications and cannot reasonably investigate or assess the reliability of the lenders to which their applications are ultimately sold.

51. T3's conduct is likely to cause substantial injury to consumers.

52. The potential benefit of obtaining a loan is not outweighed by the likelihood of injury from T3's failure to vet and monitor its purchasers.

53. T3's conduct constitutes an unfair act or practice under 12 U.S.C. §§ 5531(c)(1), 5536(a)(1)(B).

54. Grigor Demirchyan has significant responsibility for establishing T3's policies and practices, and he has substantial control over T3's operations.

55. Grigor Demirchyan knowingly or recklessly provided substantial assistance to T3, a service provider engaged in unfair acts and practices, in violation of the CFPA, 12 U.S.C. § 5536(a)(3).

56. Marina Demirchyan has significant responsibility for establishing T3's policies and practices, and she has substantial control over T3's operations.

57. Marina Demirchyan knowingly or recklessly provided substantial assistance to T3, a service provider engaged in unfair acts and practices, in violation of the CFPA, 12 U.S.C. § 5536(a)(3).

### Count II
### Abusive Acts and Practices in Violation of CFPA
### Against All Defendants

58. Plaintiff realleges and incorporates by reference paragraphs 1-41 of this Complaint.

59. The lenders to which T3 sells applications are "covered persons" under the CFPA—they extend credit for use by consumers for personal, family, or household purposes. 12 U.S.C. § 5481(15)(A)(i).

60. T3 provides a material service to covered persons in connection with the offering or provision by the covered persons of a consumer financial product or service. T3 is a "service provider" to covered persons under the CFPA. 12 U.S.C. § 5481(26)(A).

61. An act or practice is abusive if it "takes unreasonable advantage of . . . a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service." 12 U.S.C. § 5531(d)(2)(A).

62. Contrary to representations by T3 and its lead generators, consumers are likely to be steered, through T3's ping tree, to lenders offering less-favorable terms than may otherwise be available to them. In particular, consumers are likely

to be steered to lenders that charge higher interest rates than lenders that comply with state laws, that do not adhere to state usury limits, or that claim immunity from state regulation and jurisdiction. Consumers also are likely to be steered to lenders that offer contracts providing for the application of tribal law to the contract and providing an exclusive tribal or foreign dispute-resolution process.

63. The possibility of being matched by T3 with a lender that offers less-favorable terms than may otherwise be available is not disclosed to consumers by lead generators or T3. Only after consumers are filtered through the T3 ping tree and redirected from a lead generator's page to a lender's e-signature page can consumers find the offered terms and links to lengthy disclosures where lenders reveal material terms such as their tribal affiliation, claimed immunity, and mandatory dispute-resolution policies.

64. The inaccurate statements by T3 and its lead generators decrease the likelihood that consumers will read the lengthy disclosures on a lender's webpage.

65. The cost of a loan relative to what other lenders might offer, the law governing a loan contract, including whether the lender complies with laws of the consumer's state, and the available forum for raising disputes with the lender or in which the consumer might be sued by the lender are material risks, costs, or conditions of a loan product.

66. T3 knows or should know of lead generators' representations to consumers. T3 knows or should know that its process results in many, if not most, applications being steered to lenders that make loans to consumers that do not comport with express or implied representations made on lead-generator websites.

67. T3's conduct takes advantage of consumers' lack of understanding of the material risks, costs, or conditions of the products for which they apply and constitutes an abusive act or practice under 12 U.S.C. §§ 5531(d)(2)(A), 5536(a)(1)(B).

68. Grigor Demirchyan has significant responsibility for establishing T3's policies and practices, and he has substantial control over T3 operations.

69. Grigor Demirchyan knowingly or recklessly provides substantial assistance to T3, a service provider engaged in unfair acts and practices, in violation of the CFPA, 12 U.S.C. § 5536(a)(3).

70. Marina Demirchyan has significant responsibility for establishing T3's policies and practices, and he has substantial control over T3 operations.

71. Marina Demirchyan knowingly or recklessly provides substantial assistance to T3, a service provider engaged in unfair acts and practices, in violation of the CFPA, 12 U.S.C. § 5536(a)(3).

**Prayer for Relief**

Wherefore, the Plaintiff requests that the Court:

1. award injunctive relief as may be necessary to prevent consumer injury during the pendency of this action and to preserve the possibility of effective final relief;

2. permanently enjoin Defendants from committing future violations of the CFPA or any provision of "Federal consumer financial law," as defined by 12 U.S.C. § 5481(14);

3. grant additional injunctive relief as may be just and proper;

4. award damages or other monetary relief against Defendants;

5. order Defendants to pay redress to harmed consumers;

6. order disgorgement of ill-gotten revenues from Defendants;

7. impose civil money penalties against Defendants;

8. order Defendants to pay Plaintiff's costs and fees incurred in connection with prosecuting this action; and

9. award additional relief as the Court may determine to be just and proper.

Dated: June 29, 2016                    Respectfully submitted,

/s/ Kara K. Miller
Kara K. Miller
(VA Bar #47821, admitted *pro hac vice*)