ASHLEY VINSON CRAWFORD (SBN 257246)
avcrawford@akingump.com
DANIELLE C. GINTY (SBN 261809)
dginty@akingump.com
**AKIN GUMP STRAUSS HAUER & FELD LLP**
580 California Street, Suite 1500
San Francisco, CA 94014
Telephone:   415.765.9500
Facsimile:   415.765.9501

Attorneys for Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| Consumer Financial Protection Bureau,<br><br>              Plaintiffs,<br><br>    v.<br><br>D and D Marketing, Inc., d/b/a T3Leads, Grigor Demirchyan, and Marina Demirchyan,<br><br>              Defendants. | Case No. 2:15-cv-09692<br><br>(1) DEFENDANTS' NOTICE OF MOTION, MOTION TO DISMISS, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF; (2) REQUEST FOR JUDICIAL NOTICE (filed under separate cover); AND (3) [PROPOSED] ORDER (lodged under separate cover).<br><br>Date:     October 17, 2016<br>Time:    1:30 p.m.<br>Judge:  Hon. Philip S. Gutierrez<br>Ctrm:   880 |

**TO THE CLERK OF THE ABOVE-ENTITLED COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on October 17, 2016, at 1:30 p.m., or as soon thereafter as the parties may be heard, in the Courtroom of the Honorable Philip S. Gutierrez in Courtroom 880 of the United States District Court, Central District of California, located at 255 East Temple Street, Los Angeles, California 90012-3332, Defendants D and D Marketing, Inc., d/b/a T3Leads, Grigor Demirchyan, and Marina Demirchyan will, and hereby do, move this Court for dismissal with prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion").  The Motion is made following conferences of counsel, pursuant to C.D. Cal. R. 7-3, which took place on May 2, 2016 and July 25, 2016.

The Motion requests dismissal with prejudice of the Amended Complaint filed by plaintiff Consumer Financial Protection Bureau ("Bureau") for failure to state a claim on which relief can be granted on the grounds that (i) the Bureau does not have authority to bring this action, (ii) construing the alleged conduct as "unfair" or "abusive" under the Consumer Financial Protection Act, 12 U.S.C. §§ 5481-5603, would render the statute unconstitutionally vague *as applied* to Defendants, (iii) the Bureau has not adequately pled its claims, and (iv) the Bureau cannot recover much of the relief it seeks.

The Motion is based on this Notice, the Memorandum of Points and Authorities attached hereto, the Request for Judicial Notice filed herewith, all pleadings and papers filed in this action, and such additional papers and arguments as may be presented at, or in connection with, the hearing.

Dated:  August 1, 2016                    AKIN GUMP STRAUSS HAUER & FELD LLP

By _/s/ Ashley Vinson Crawford_____
                    Ashley Vinson Crawford
                    Danielle C. Ginty
Attorneys for Defendants D and D Marketing, Inc., d/b/a T3Leads, Grigor Demirchyan, and Marina Demirchyan

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................................... 1

ALLEGATIONS OF COMPLAINT.............................................................. 3

I.   THE BUREAU DOES NOT HAVE AUTHORITY TO BRING THIS
     ACTION. ............................................................................. 4

     A.   T3 Is Not A Service Provider Under The CFPA. .................. 5

     B.   The Bureau Would Not Have Authority To Bring An Enforcement
          Action Against T3 Even If It Were A Service Provider................ 7

II.  CONSTRUING T3'S ALLEGED CONDUCT AS "UNFAIR" OR
     "ABUSIVE" UNDER THE CFPA WOULD VIOLATE DEFENDANTS'
     DUE PROCESS RIGHT TO FAIR NOTICE........................................ 8

     A.   Due Process Demands That A Statute Give Fair Notice Of What
          Conduct Is Prohibited Or Required. .............................. 8

     B.   Existing Law Does Not Give Service Providers Notice That They
          Must Monitor Independent Third Parties With Which They Do
          Business................................................... 10

     C.   Defendants Did Not Have Fair Notice That The Alleged Conduct
          Could Be "Unfair" Under The CFPA..............................11

     D.   Defendants Did Not Have Fair Notice That The Alleged Conduct
          Could Be "Abusive" Under The CFPA. ........................ 14

III. THE BUREAU HAS NOT ADEQUATELY ALLEGED A VIOLATION
     OF THE CFPA............................................................. 16

     A.   The Complaint Fails To Adequately Plead That T3 Engaged In Any
          Unfair Acts or Practices........................................ 16

     B.   The Complaint Fails To Adequately Plead That T3 Engaged In Any
          Abusive Acts Or Practices...................................... 19

     C.   The Complaint Fails To Allege Facts Sufficient To Support Section
          5536(a)(3) Claims Against The Individual Defendants. ........... 20

          1.   The Complaint does not plausibly allege that the Demirchyans
               acted knowingly or recklessly........................... 21

          2.   The Complaint does not plausibly allege that the Demirchyans
               substantially assisted T3................................ 23

IV.  THE BUREAU CANNOT RECOVER THE RELIEF IT SEEKS. ............... 24

V.   CONCLUSION........................................................... 25

# <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

## CASES

*Ambrose v. Coffey*,
   696 F. Supp. 2d 1119 (E.D. Cal. 2010)..................................................18

*Amini Innovation Corp. v. KTY Int'l Mktg.*,
   768 F. Supp. 2d 1049 (C.D. Cal. 2011) ................................................21

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)....................................................................18, 19, 21

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)..................................................................................22

*Bresgal v. Brock*,
   843 F.2d 1163 (9th Cir. 1987)..................................................................9

*C.F.P.B. v. CashCall, Inc., et. al*,
   Case No. 2:15-cv-07522-JFW-RAO (C.D. Cal., filed Aug. 15, 2015) ................12

*C.F.P.B. v. NDG Fin. Corp., Northway Fin. Corp., et al.*,
   Case No. 1:15-cv-05211-CM  (S.D.N.Y., filed March 16, 2016) ........................13

*Camp v. Dema*,
   948 F.2d 455 (8th Cir. 1991)..................................................................23

*Castillo Grand, LLC v. Sheraton Operating Corp.*,
   719 F.3d 120 (2d Cir. 2013)....................................................................25

*Christopher v. SmithKline Beecham Corp.*, ___ U.S. ___,
   132 S. Ct. 2156 (2012)..............................................................................9

*City & Cty. of San Francisco v. U.S. Dep't of Transp.*,
   796 F.3d 993 (9th Cir. 2015).....................................................................6

*Consumer Fin. Prot. Bureau v. ITT Educ. Servs., Inc.*,
   No. 1:14-CV-00292-SEB, 2015 WL 1013508, at *30 (S.D. Ind. Mar. 6, 2015) .15, 17

*Consumer Financial Protection Bureau v. Universal Debt & Payment Solutions, LLC, et al.*,
   Case No. 1:15-CV-0859-RWS (Sept. 1, 2015 N.D. Ga.)....................................21

*Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*,
   911 F.2d 242 (9th Cir. 1990)..................................................................12

*Countrywide Fin. Corp. Mortgage Mktg. & Sales Practices Litig.*,
   601 F. Supp. 2d 1201 (S.D. Cal. 2009).......................................12, 15, 16

*Davis v. Chase Bank U.S.A., N.A.*,
   650 F. Supp. 2d 1073 (C.D. Cal. 2009) ..................................................18

*Davis v. HSBC Bank Nev., N.A.,*
    691 F.3d 1152 (9th Cir. 2012) ..................................................................... 13, 14

*DiLeo v. Ernst & Young,*
    901 F.2d 624 (7th Cir. 1990) ............................................................................ 22

*Durham v. Kelly,*
    810 F.2d 1500 (9th Cir. 1987) .......................................................................... 24

*F.C.C. v. Fox Television Stations, Inc.,* ___ U.S. ___,
    132 S. Ct. 2307 (2012) ................................................................................ 8, 11

*F.T.C. v. IFC Credit Corp.,*
    543 F. Supp. 2d 925 (N.D. Ill. 2008) ............................................................... 12

*F.T.C. v. Wyndham Worldwide Corp.,*
    799 F.3d 236 (3d Cir. 2015) ............................................................................... 9

*Hensley v. Eckerhart,*
    461 U.S. 424 (1983) .......................................................................................... 25

*Hollinger v. Titan Capital Corp.,*
    914 F.2d 1564 (9th Cir. 1990) .......................................................................... 22

*In re Toyota Motor Corp.,*
    790 F. Supp. 2d 1152 (C.D. Cal. 2011) ............................................................ 24

*Landgraf v. USI Film Products,*
    511 U.S. 244 (1994) ............................................................................................ 2

*Mendelsohn v. Capital Underwriters, Inc.,*
    490 F. Supp. 1069 (N.D. Cal. 1979) ................................................................. 23

*N.L.R.B. v. Bell Aerospace Co. Div. of Textron,*
    416 U.S. 267 (1974) ............................................................................................ 9

*Price v. Stevedoring Servs. of Am., Inc.,*
    697 F.3d 820 (9th Cir. 2012) .............................................................................. 9

*Rolf v. Blyth, Eastman Dillon & Co.,*
    570 F.2d 38 (2d Cir. 1978) ................................................................................ 21

*S.E.C. v. Chenery Corp.,*
    332 U.S. 194 (1947) .......................................................................................... 10

*Sanders v. John Nuveen & Co.,*
    554 F.2d 790 (7th Cir. 1977) ............................................................................ 21

*Semegen v. Weidner,* 7
    80 F.2d 727 (9th Cir. 1985) .............................................................................. 18

*Sheets v. DHI Mortgage Co.,*
    No. CV F 09-1030-LJO-DLB, 2009 WL 2171085, at *4 (E.D. Cal. July 20, 2009).
    ................................................................................................................... 15, 20

*Smith v. United States,* 508 U.S. 223 (1993) ........................................................ 6

iii

*Somers v. Apple, Inc.*,
    729 F.3d 953 (9th Cir. 2013) ................................................................25

*Tashiro-Townley v. Bank of N.Y. Mellon*, No. C10-1720-JCC,
    2016 WL 3551810, at *3 (W.D. Wash. June 30, 2016) ...........................18

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
    497 F.3d 144 (2d Cir. 2007) ................................................................16

*U.S., ex rel. Modglin v. DJO Glob. Inc.*,
    114 F. Supp. 3d 993 (C.D. Cal. 2015) ....................................................21

*Vess v. Ciba–Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) ...............................................................18

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982) ............................................................................9

*Whittlestone, Inc. v. Handi–Craft Co.*,
    618 F.3d 970 (9th Cir. 2010) ................................................................24

*Williams v. Walker-Thomas Furniture Co.*,
    350 F.2d 445 (D.C. Cir. 1965) ..............................................................15

*Wiltz v. Bayer CropScience, Ltd. P'ship*,
    645 F.3d 690 (5th Cir. 2011) ................................................................10

*Woods v. Barnett Bank of Ft. Lauderdale*,
    765 F.2d 1004 (11th Cir. 1985) .............................................................21

*Woodward v. Metro Bank of Dallas*,
    522 F.2d 84 (5th Cir. 1975) ..................................................................23

**STATUTES**

12 C.F.R. § 225.28(a) ..............................................................................6, 7

12 C.F.R. § 225.28(b) ..............................................................................6, 7

12 C.F.R. § 225.86(d)(1) ..............................................................................7

12 U.S.C. § 1831d ......................................................................................12

12 U.S.C. § 1843(c)(8) .................................................................................6

12 U.S.C. § 1864(f) ..................................................................................6, 7

12 U.S.C. § 1867(c) .................................................................................7, 8

12 U.S.C. § 5481(19) ...................................................................................5

12 U.S.C. § 5481(26) ...................................................................................5

12 U.S.C. § 5481(27) ...................................................................................5

12 U.S.C. § 5481(6) .....................................................................................5

iv

12 U.S.C. § 5514 .................................................................................................. 7, 8

12 U.S.C. § 5515 ..................................................................................................... 8

12 U.S.C. § 5531(a) ................................................................................................ 4

12 U.S.C. § 5531(c)(1) ......................................................................................... 11

12 U.S.C. § 5531(d) .............................................................................................. 14

12 U.S.C. § 5531(d)(2)(A) ............................................................................. 14, 20

12 U.S.C. § 5536(a)(3) ..........................................................................20, 21, 23, 24

12 U.S.C. § 5538(b)(7) .......................................................................................... 25

12 U.S.C. § 5564(a) ................................................................................................ 7

12 U.S.C. § 5565(b) .............................................................................................. 25

12 U.S.C. § 5565(c)(2) .......................................................................................... 25

12 U.S.C. § 85 ....................................................................................................... 12

15 U.S.C. § 78r ...................................................................................................... 25

15 U.S.C. § 78t(e) ..........................................................................................21, 22

18 U.S.C. 5531(b) ................................................................................................. 10

# OTHER AUTHORITIES

8 Williston on Contracts § 18:9 (4th ed. 2016)................................................... 15

BLACK'S LAW DICTIONARY (10th ed. 2014) ......................................................... 6

Carey Alexander, *Abusive: Dodd-Frank Section 1031 and the Continuing Struggle to Protect Consumers*,
85 St. John's L. Rev. 1105, 1122 n.89 (2011)........................................................ 15

Securities and Exchange Act of 1934 ................................................................... 21

Securities and Exchange Act of 1934 § 10(b)....................................................... 22

## INTRODUCTION

Defendant D and D Marketing, Inc. d/b/a/ T3Leads ("T3") is a lead aggregator offering leads to the consumer lending industry.  It buys consumer loan applications (or "leads") from independent lead generation companies, or in some cases generates them on its own websites, and sorts the leads through an automated "ping tree" system, which matches the leads to parameters set by independent lenders and other lead purchasers to whom it sells the leads.  When a customer submits an application on a lead generator's webpage, he or she is then immediately redirected, through the ping tree, to a lender's webpage, where he or she can review the terms of the offered loan and ultimately decide whether to proceed with the loan.  This automated process takes just seconds:



The Consumer Financial Protection Bureau (the "Bureau") filed this enforcement action against T3 stating that its conduct is "unfair" and "abusive" in violation of the Consumer Financial Protection Act (the "CFPA"), but *remarkably has not identified a single instance of unlawful conduct committed by T3 or Defendants Marina and Grigor Demirchyan*, who allegedly substantially assisted T3 in the alleged violations.  Instead, the Bureau's unprecedented theory is that T3 is obligated to monitor and, in effect, police the conduct of the independent lead generators and lead purchasers with which it does business, and by failing to do so effectively, T3 itself is violating the CFPA.  According to the Bureau, T3's failure to effectively monitor its lead generators and lead purchasers (i) is "unfair" because it permits consumers to be exposed to those businesses' allegedly unlawful conduct and thus is likely to cause consumers substantial harm, and (ii) is "abusive" because it takes unreasonable advantage of consumers' lack

of understanding of the material risks, costs, and conditions of their loans.

The Complaint cannot be sustained for the following reasons.

*First*, the Bureau does not have the statutory authority to regulate T3. The ministerial finding service T3 provides to lenders does not make it a "service provider" subject to regulation under the CFPA. And even if it were a service provider, express statutory limitations on the Bureau's litigation authority over service providers apply here to prevent the Bureau from bringing an enforcement action against Defendants.

*Second*, the CFPA cannot be construed, consistent with due process, to penalize Defendants for failing to undertake a duty that is not required by any existing statute, regulation, rule, common law, or other authority. The Bureau's novel construction of the CFPA would impose untenable obligations on T3 to predict unsettled law, police independent third parties to ensure the lawfulness of their conduct, and guarantee the suitability of loans—a duty not even lenders owe. "Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly. . . ." *Landgraf v. USI Film Products*, 511 U.S. 244, 265-66 (1994). Construing the CFPA to deem T3's conduct "unfair" or "abusive" absent fair notice of what conduct the statute requires would violate Defendants' right to due process and render the statute unconstitutionally vague *as applied* to Defendants.

*Third*, the Bureau does not and cannot plead sufficient facts to state a plausible claim for relief under the CFPA. The Bureau does not identify *any* conduct by lead generators or lead purchasers that T3 could or should have recognized as unlawful. Moreover, the Bureau cannot establish that T3 is responsible for preventing such conduct, when consumers have the means and duty to prevent it themselves. As the Bureau acknowledges, the lenders' websites provide lengthy disclosures revealing the material terms of the offered loans, negating any of the purportedly misleading statements made by the lead generators. Consumers, like any contracting party, have the duty to read and understand the terms of the agreements they enter.

*Finally*, even if the Complaint could survive its other fatal deficiencies, the

2

1   Bureau cannot recover much of the relief it seeks.

2      For all of these reasons, the Complaint should be dismissed with prejudice.[1]

3   ### **ALLEGATIONS OF COMPLAINT**

4      *The Complaint alleges the following well-pled facts, which are assumed as true*

5   *for the purposes of this Motion only*:  Defendant T3 is a lead aggregator; it is in the

6   business of buying consumer loan-applications from lead generators and selling them as

7   "leads" to small-dollar, short-term lenders and other purchasers.  Amended Complaint

8   (Doc. No. 37) ("Complaint" or "AC"), Intro., ¶¶ 5, 8, 11.  These other purchasers

9   include data managers, which are "intermediaries for lenders that outsource their lead-

10   purchasing activities[;]" data brokers, which "are lead aggregators that have their own

11   networks of purchasers to which they sell loan applications after they purchase them

12   from T3 data brokers[;]" and remarketing companies, which "buy consumer information

13   to market products other than the loans for which consumers applied."  *Id.*, ¶¶ 13, 14.

14   T3 also acts as its own lead generator in some instances.  *Id.*, ¶ 9.

15      To offer the leads for sale to purchasers, T3 uses an automated "ping tree," which

16   sets the order in which purchasers have the opportunity to review and acquire a given

17   lead from T3.  *Id.*, ¶ 16.  The position of each purchaser in the ping tree is determined

18   by the loan application parameters set by the purchasers, including the price a purchaser

19   is willing to pay for the application.  *Id.*, ¶¶ 16, 26.  When a customer submits an

20   application on a lead generator's webpage, he or she is then immediately redirected

21   (through the ping tree) to a lender's webpage.  *Id.*, ¶ 18.  There, he or she can read

22   disclosures that reveal the identity of the lender and the terms of the offered loans,

23   including, for example, whether the lender is an entity organized by a Native American

24   Indian tribe (a "tribal lender") or under the laws of a foreign jurisdiction (an "offshore

25   lender"), whether the lender claims immunity from state laws or regulation, whether the

26

27   _____

28      [1] Defendants also join in and incorporate by reference Dmitry Fomichev's
     argument that the unprecedented structure of the CFPB is unconstitutional.  *C.F.P.B. v.
     Fomichev*, Case No. 2:16-cv-2724-PSG (Ex), Doc. No. 29.

lender concedes that it is subject to jurisdiction in a state forum, and any "mandatory dispute-resolution policies." *Id.*, ¶¶ 31-32, 63.

*The Complaint also alleges, albeit not sufficiently, the following facts*:  T3 does not effectively vet and monitor the conduct of its lead generators, yet knows or has reason to believe that the websites of lead generators with which it does business contain misleading or inaccurate statements, and that the lead-generating websites that T3 owns and operates also contain misleading or inaccurate statements. *Id.*, ¶¶ 19-20. According to the Bureau, these statements are likely to mislead consumers into believing that (i) the lenders to which they will be directed have been evaluated and meet certain standards, (ii) the lead generator is a lender, or (iii) the lead generator will help consumers find the best rates, lowest fees, or most appropriate lenders. *Id.*, ¶¶ 21-23.  T3 also does not effectively vet and monitor the conduct of its lead purchasers, yet knows or has reason to believe that tribal and offshore lenders typically charge higher interest rates than do lenders adhering to state laws, and such lenders "are willing to pay competitive prices for applications and regularly rank at the top of the T3 ping tree." *Id.*, ¶ 33.  According to the Bureau, T3's process allows lenders to receive leads for residents of states where they are unlicensed. *Id.*, ¶¶ 41.

# I.    THE BUREAU DOES NOT HAVE AUTHORITY TO BRING THIS ACTION.

The Bureau seeks to impose liability on T3 as a "service provider" under the CFPA, which authorizes the Bureau to commence a civil action seeking to "prevent a . . . service provider from committing or engaging in an unfair, deceptive or abusive act or practice . . . in connection with . . . the offering of a consumer financial product or service."  12 U.S.C. § 5531(a); AC, ¶¶ 44, 60.  The CFPA does not authorize this enforcement action because (i) T3 is not a "service provider" as defined by the CFPA, and (ii) the CFPA limits the Bureau's enforcement authority to certain categories of "service providers," none of which apply here.

### A.     T3 Is Not A Service Provider Under The CFPA.

The CFPA defines a "service provider" as

[A]ny person that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service, including a person that —

> (i) participates in designing, operating, or maintaining the consumer financial product or service; or

> (ii) processes transactions relating to the consumer financial product or service . . .

The term "service provider" does not include a person solely by virtue of such person offering or providing to a covered person-- (i) a support service of a type provided to businesses generally or a similar ministerial service. . . .

12 U.S.C. § 5481(26).  Thus, to qualify as a "service provider," a person must (i) provide a material service (ii) that is not a support service of a type provided to businesses generally or a similar ministerial service (iii) to a covered person (iv) in connection with the offering or provision of a consumer financial product or service.  *Id.*

The Bureau bases its claims on T3's provision of services to lenders.[2]  AC, ¶¶ 43, 59.  Although the Complaint is unclear, presumably, the "material services" T3 allegedly provides are "receiving loan applications from lead generators and selling the application as leads to lenders."  *Id.*, ¶ 5.  But even assuming the lenders to which T3 sells leads are "covered persons" under the CFPA,[3] T3 is not a "service provider" under the statute because the services it provides are support and ministerial services of a type provided to businesses generally and are thus excluded from the CFPA.

The CFPA does not define "ministerial" services, and the Bureau has not enacted

---

[2] The data managers, data brokers, and remarketing companies referenced in the Complaint are not alleged to be "covered persons" under the CFPA.

[3] It is by no means clear that the unidentified "tribal lenders" are "covered persons[.]"  *Compare* 12 U.S.C. § 5481(6) (defining "covered person" as "any person . . .") *and id.*, § 5481(19) (defining "person" as an "individual, partnership, company, corporation, association incorporated or unincorporated trust, estate, cooperative organization, or other entity.") *with id.*, § 5481(27) ("The term 'State' means any State, territory, or possession of the United States . . . or any federally recognized Indian tribe, as defined by the Secretary of the Interior under section 479a-1(a) of Title 25.").

regulations providing any guidance on the types of services that fall outside the CFPA. "When a word is not defined by statute, [courts] normally construe it in accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993).  A "ministerial service" is "an act that involves obedience to instructions or laws instead of discretion, judgment, or skill[.]"  BLACK'S LAW DICTIONARY (10th ed. 2014).

The Complaint alleges only that T3 purchases leads from lead generators and sells the leads to lenders.  AC, ¶ 5.  These services do not involve the exercise of any discretion.  As the Complaint acknowledges, this is an "automated process" that takes "just seconds[.]"  *Id.*, ¶ 19.  The Complaint does not allege, for example, that T3 is in any way involved in determining borrower criteria, the decision to accept or reject borrowers' applications, or in setting loan terms.  Nor could it, as these are not services T3 provides.  T3 simply aggregates leads, electronically sorts them pursuant to lender-supplied requirements, and passes them on to lenders.  While these may be convenient services, they are not the type of services subject to the CFPA.

The legislative history of the CFPA confirms that it was not intended to apply to the types of services T3 provides.  *City & Cty. of San Francisco v. U.S. Dep't of Transp.*, 796 F.3d 993, 998 (9th Cir. 2015).  The CFPA's definition of "service provider" was "designed to create authority that is generally comparable to the authority that federal banking regulators have under the Bank Service Company Act."  S. REP. 111-176, 160-61.  The Bank Service Company Act gives banking regulators authority to regulate activities of bank service companies that are "so closely related to banking as to be a proper incident thereto." 12 U.S.C. §§ 1864(f), 1843(c)(8).  Banking regulators have identified fourteen such "[c]losely related nonbanking activities" that include, for example, extending credit and servicing loans and collection agency services.  12 C.F.R. § 225.28(a).  None of the listed activities include purchasing leads and selling them to lenders, the type of service T3 provides.  *Id.*, § 225.28(b).  Indeed, the same regulations confirm that "[a]cting as a finder in bringing together one or more buyers and sellers of any product or service for transactions that the parties themselves negotiate and

consummate[,]" like the services T3 provides, are "incidental to financial activities[.]" *Id.*, § 225.86(d)(1).  Nor would it make sense for lead generation and aggregation services to be included, since these services are among the most common marketing techniques employed in the Internet age by a variety of businesses.[4]  These types of services are explicitly excluded from the statute's reach.

### B. The Bureau Would Not Have Authority To Bring An Enforcement Action Against T3 Even If It Were A Service Provider.

Even if T3 were a service provider, express limitations on the Bureau's litigation authority bar this action.  Section 5564(a) provides, "If any person violates a Federal consumer financial law, the Bureau may, *subject to sections 5514*, . . . commence a civil action against such person to impose a civil penalty or to seek all appropriate legal and equitable relief . . . ."  12 U.S.C. § 5564(a) (emphasis added).  Section 5514 gives the Bureau authority over only those service providers that an appropriate Federal banking agency would have authority to regulate "as if such service provider were engaged in a service relationship with a bank, and the Bureau were an appropriate Federal banking agency under section 1867(c) of this title."  *Id.*, § 5514(e).

Section 1867(c) governs situations where a bank arranges for another party to perform certain functions that might otherwise be performed by the bank itself.  Under the section, Federal banking agencies can regulate the activities, functions, and operations of third-party service providers to the same extent as if they were performed by the bank itself.  12 U.S.C. § 1867(c).  As discussed above, under the Bank Service Company Act and related regulations, these third-party service providers are authorized to perform certain services that are so closely related to banking as to be a proper incident thereto.  Those services *do not* include the type of service T3 provides.  12 U.S.C. §§ 1864(f), 1843(c)(8); 12 C.F.R. § 225.28(a), (b).

---

[4] *See* Jessica L. Rich, Director, FTC Bureau of Consumer Protection, Introductory Remarks to Follow the Lead: An FTC Workshop on Lead Generation, *available at* https://www.ftc.gov/public-statements/2015/10/introductory-remarks-follow-lead-ftc-workshop-lead-generation.

Other provisions of the CFPA are not so limiting.  Section 5515, which applies to certain insured depository institutions and insured credit unions and their affiliates, provides, "A service provider . . . shall be subject to the authority of the Bureau under this section, *to the same extent as if the Bureau were an appropriate Federal banking agency under section 1867(c) of this title*."  12 U.S.C. § 5515(d).  Unlike section 5515, which gives the Bureau the same enforcement authority as Federal banking agencies over all service providers, section 5514 is more limiting, giving the Bureau the same enforcement authority as Federal banking agencies *only if* the service provider is engaged in a service relationship that would be regulated under the Bank Service Company Act.  Because the "finder" services T3 provides to lenders are not services that would be regulated by any Federal banking agency, the Bureau does not have authority to bring this enforcement action against T3.

## II.   CONSTRUING T3'S ALLEGED CONDUCT AS "UNFAIR" OR "ABUSIVE" UNDER THE CFPA WOULD VIOLATE DEFENDANTS' DUE PROCESS RIGHT TO FAIR NOTICE.

The CFPA fails to give Defendants fair notice that the alleged conduct could be "unfair" or "abusive" and thus is unconstitutionally vague *as applied* to Defendants.

### A.   Due Process Demands That A Statute Give Fair Notice Of What Conduct Is Prohibited Or Required.

It is a bedrock principle of due process that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *F.C.C. v. Fox Television Stations, Inc.*, ___ U.S. ___, 132 S. Ct. 2307, 2317 (2012).  "This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment . . . [and] requires the invalidation of laws that are impermissibly vague."  *Id.*  "[T]he void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way."  *Id.*

8

While "statutes [like the CFPA] regulating economic activity receive a 'less strict' [vagueness] test," that is "because their 'subject matter is often more narrow, and because *businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action*.'" *F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 255 (3d Cir. 2015) (emphasis added) (citing *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982)). "It is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding and demands deference." *Christopher v. SmithKline Beecham Corp.*, ___ U.S. ___, 132 S. Ct. 2156, 2168-69 (2012).

For this reason, the Bureau's novel construction of the CFPA's proscriptions on "unfair" and "abusive" conduct, *which it has set forth for the first time in this enforcement action*, is entitled to "no more deference than is the interpretation of any party to the suit." *Bresgal v. Brock*, 843 F.2d 1163, 1168 (9th Cir. 1987). As the Ninth Circuit has cautioned, "deferring to agencies' litigating positions interpreting statutes they are charged with administering would create a danger that agencies would avoid promulgating regulations altogether, given the comparative ease of announcing a new statutory interpretation in a brief rather than through formal rulemaking. This result would severely undermine the notice and predictability to regulated parties that formal rulemaking is meant to promote." *Price v. Stevedoring Servs. of Am., Inc.*, 697 F.3d 820, 830 (9th Cir. 2012).

Indeed, these principles also demonstrate why the Bureau's attempt to create precedent of general applicability by setting an example through this enforcement action is an abuse of its discretion. *N.L.R.B. v. Bell Aerospace Co. Div. of Textron*, 416 U.S. 267, 294 (1974). While agencies often have discretion to proceed by adjudication rather than rulemaking, this choice is appropriate only in limited circumstances, none of which

9

is applicable here.  *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 202–03 (1947).

**B.    Existing Law Does Not Give Service Providers Notice That They Must Monitor Independent Third Parties With Which They Do Business.**

Underlying both of the Complaint's claims for relief is the premise that T3 is and was required to undertake an ongoing, affirmative duty to "vet and monitor" the conduct of the third parties with which it does business.  Defendants cannot have reasonably anticipated such a requirement because neither the CFPA nor established public policy impose any such affirmative duty.  Indeed, Defendants are not aware of any case law, statute, regulation, rule, or other agency guidance that requires any service provider to "vet and monitor" the conduct of the third parties with which they do business.

Apart from this enforcement action, the Bureau has not issued any guidance— through formal regulation, rule, order, bulletin, or otherwise—suggesting that service providers are required to "vet and monitor" the independent activities of third parties. This is telling, because the CFPA explicitly permits the Bureau to "prescribe rules . . . identifying as unlawful, unfair, deceptive, or abusive acts or practices" and specifically allows "[r]ules under this section [to] include requirements for the purpose of preventing such acts or practices."  18 U.S.C. § 5531(b).

In fact, while the Bureau has issued guidance notifying banks and nonbank covered persons that they should take affirmative steps to conduct "thorough due diligence" and "on-going monitoring" of the service providers with which they do business, it has not issued any guidance to service providers imposing comparable, reciprocal obligations.  *See, e.g.*, Request for Judicial Notice ("RJN"), Exs. A, B at 18-19.  Nor would it make any sense for the Bureau to do so, because the law generally does not require service providers to monitor those with which they do business.[5]

Thus, Defendants could not reasonably have foreseen before this enforcement

---

[5] For example, T3 could not be held liable in tort for failing to monitor lead generators or purchasers.  Tort law generally does not impose a duty to take affirmative steps to protect another from purely economic loss.  *Wiltz v. Bayer CropScience, Ltd. P'ship*, 645 F.3d 690, 695 (5th Cir. 2011).

action that T3 was required to take *some type of still unidentified* affirmative steps to "vet and monitor" the independent third parties with which it did business. In fact, even the Complaint fails to give fair notice of the level or type of vetting or monitoring that the Bureau would consider lawful. Without any guidance, how could T3 (or any service provider) be expected, *even going forward*, to "know what is required of them?" *Fox*, __ U.S. ___, 132 S. Ct. at 2317.

### C.   Defendants Did Not Have Fair Notice That The Alleged Conduct Could Be "Unfair" Under The CFPA.

Defendants could not have reasonably foreseen that T3's failure to "vet and monitor" its lead generators and lead purchasers could be "unfair." The Bureau's authority under the CFPA to declare an act or practice "unfair" is expressly limited to those situations where "the Bureau has a reasonable basis to conclude that -- (A) the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and (B) such substantial injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c)(1).

The Bureau contends that T3's failure to effectively vet and monitor its lead generators and lead purchasers is unfair because it allows lead generators to make misrepresentations on their websites, lenders to issue loans in violation of state usury laws, and unidentified entities to engage in improper debt collection practices. AC, ¶¶ 19, 27, 36. But Defendants could not have reasonably anticipated that T3's failure to police these independent third parties' conduct could be deemed unfair, when it is by no means clear that the purportedly unlawful conduct is *actually* unlawful or that T3 has any power to affect it.

None of the lead generators' statements identified in the Complaint is unlawful under existing law. For example, the Bureau contends that lead generators falsely represent that consumers will receive "reasonable" rates or the "best rates or lowest fees[,]" or will be matched with "appropriate" lenders, all of which are classic examples of inactionable puffery. AC, ¶¶ 21, 23; *In re Countrywide Fin. Corp. Mortgage Mktg. &*

*Sales Practices Litig.*, 601 F. Supp. 2d 1201, 1217 (S.D. Cal. 2009); *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 246 (9th Cir. 1990).

The Bureau also alleges that lead generators use website names or make representations that falsely suggest consumers are submitting their application directly to lenders.  AC, ¶ 22.  But even if the cited statements were misleading, they are not unlawful because, as the Bureau alleges, consumers are automatically redirected to lenders' websites, which disclose the identity of the lender and the terms of the offered loans.  *Id.*, ¶¶ 63; *F.T.C. v. IFC Credit Corp.*, 543 F. Supp. 2d 925, 946 (N.D. Ill. 2008) ("Long-standing principles of contract and sound public policy impose a duty on contracting parties to understand the obligations they are assuming, and if they do not, they cannot be heard to later complain about a lack of understanding.").

Moreover, the Bureau's claim that lead generators falsely represent that lenders comply with all applicable laws is untenable for the same reason its claim that the lenders violate state usury laws fails.  AC, ¶¶ 21, 27-41.  It is by no means settled that state usury laws apply to tribal or offshore lenders.[6]  Defendants are not aware of any case holding that an offshore or tribal lender is required to comply with state usury laws.  Indeed, the Bureau is actively litigating at least two other enforcement actions in which the applicability of state usury laws to tribal and offshore lenders is an open and disputed issue.  *See, e.g.*, *C.F.P.B. v. CashCall, Inc., et. al*, Case No. 2:15-cv-07522-JFW-RAO (C.D. Cal., filed Aug. 15, 2015) (the "CashCall Action");[7] *C.F.P.B. v. NDG Fin. Corp., Northway Fin. Corp., et al.*, Case No. 1:15-cv-05211-CM  (S.D.N.Y., filed

---

[6] It is unclear whether the Bureau contends that other domestic lenders with which T3 does business fail to comply with state usury laws. *See, e.g., id.*, ¶¶ 27-41, 48. However, even domestic lenders are not automatically subject to all states' usury laws. For example, lenders subject to the National Bank Act and state-chartered FDIC-insured lenders are entitled to apply the usury regulations of their home state when lending in other states.  12 U.S.C. §§ 85, 1831d.

[7] Recent summary judgment briefing in the CashCall Action demonstrates that the resolution of this question as to tribal lenders involves complex analyses of tribal sovereignty, choice-of-law rules, and states' varying approaches to the regulation of lending. *See, e.g., id.*, Doc. Nos. 139, 159, 163, 167, 184, 188.  Notably, the Bureau did not even sue the tribal lending entity that issued the challenged loans. *Id.*, Doc. No. 27.

March 16, 2016), Doc. No. 47.  Given this unsettled issue, Defendants cannot have been expected to anticipate that failing to effectively vet and monitor the lenders with which T3 worked could cause consumers substantial injury.

The only other purportedly unlawful conduct identified in the Complaint involves unidentified "entities operating or purporting to operate in the small-dollar-loan industry . . . contacting consumers to collect non-existent debt."  AC, ¶ 36.  But the Complaint does not accuse T3 or any of the lead generators or lead purchasers with which it did business of engaging in or even being connected to such activity.  *Id.*  Even if the Bureau could show such a link, this example highlights how untenable the Bureau's theory of liability in this case truly is—T3's alleged failure to "vet and monitor" the independent third parties it does business with (and thus presumably the independent third parties with which they in turn did business) is simply too attenuated to have caused consumers harm, or for Defendants to have reasonably anticipated that it could.

Nevertheless, even if T3's alleged failure to act could have exposed consumers to unlawful conduct, established law confirms that any potential injury to consumers resulting from T3's conduct was and is reasonably avoidable, and, thus, Defendants could not have anticipated that T3's conduct could satisfy the second prong of the CFPA's unfairness test.  "In determining whether consumers' injuries [are] reasonably avoidable, courts look to whether the consumers [have] a free and informed choice." *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012).  "An injury is reasonably avoidable if consumers 'have reason to anticipate the impending harm and the means to avoid it,' or if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact.'"  *Id.* at 1168–69.

Any injury that may befall consumers as a result of the allegedly unlawful conduct of the lead generators and lead purchasers with which T3 does business is reasonably avoidable.  As the Bureau notes, once consumers are "redirected from a lead generator's page to a lender's e-signature page" they can "find the offered terms and links to lengthy disclosures where lenders reveal material terms such as their tribal

affiliation, claimed immunity, and mandatory dispute-resolution policies." AC, ¶ 63. Consumers are obligated to read and understand the terms of their agreements. *IFC Credit*, 543 F. Supp. 2d at 946. The Bureau does not and cannot contend that consumers were bound to accept the loan terms offered to them, or were prevented from comparison shopping or researching the licensing status of, or any disciplinary actions against, the lenders. Consumers undeniably have the means and ability to avoid any injury that could be caused by the allegedly unlawful conduct of the lead generators and lead purchasers with which T3 did business. *Davis*, 691 F.3d at 1169 (disclaimers in agreement demonstrated that injury was reasonably avoidable).

For all these reasons, Defendants could not reasonably foresee that T3 was required to "vet and monitor" the third parties with which it does business, or that its failure to do so "effectively" could cause substantial, unavoidable injury to consumers in violation of the CFPA's unfairness test. Construing the CFPA to penalize Defendants under these circumstances would violate their due process right to fair notice of what the CFPA requires and render the statute unconstitutional *as applied* to Defendants.

### D. Defendants Did Not Have Fair Notice That The Alleged Conduct Could Be "Abusive" Under The CFPA.

The CFPA also prohibits "abusive" acts and practices. 12 U.S.C. § 5531(d). However, the statute expressly limits the Bureau's ability to deem an act or practice "abusive" to specified situations. *Id*. Here, the Bureau asserts that T3's failure to "effectively vet and monitor" its lead generators and lenders violates section 5531(d)(2)(A) of the statute, which prohibits conduct that "takes unreasonable advantage of a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service." AC, ¶ 67.

Although few courts have interpreted the CFPA's prohibition of "abusive" acts and practices, it is generally understood to be a statutory codification of the common law doctrine of unconscionability. *See, e.g.*, *Consumer Fin. Prot. Bureau v. ITT Educ. Servs., Inc.*, No. 1:14-CV-00292-SEB, 2015 WL 1013508, at *30 (S.D. Ind. Mar. 6,

14

2015); Carey Alexander, *Abusive: Dodd-Frank Section 1031 and the Continuing Struggle to Protect Consumers*, 85 St. John's L. Rev. 1105, 1122 n.89 (2011). "Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C. Cir. 1965); .8 Williston on Contracts § 18:9 (4th ed. 2016).

According to the Bureau, T3's failure to "vet and monitor" lead generators and lenders is abusive because it permits consumers to be steered to lenders "offering less-favorable terms than may otherwise be available to them" or making "loans to consumer that do not comport with express or implied representations made on lead-generator websites." AC, Intro., ¶¶ 62-66. Even if T3 was required to undertake an affirmative duty to "vet and monitor" its lead generators and lead purchasers, Defendants could not have reasonably foreseen that T3's failure to do so "effectively" could take "unreasonable advantage" of any consumers' "lack of understanding" of the material terms of their loans, much less rise to the level of unconscionability.

T3 cannot be expected to police and prevent conduct that it does not know is unlawful. The Bureau has not identified any conduct of T3's lead generators or lead purchasers that Defendants should have known to actually be unlawful. Section II.C., *supra*. Nor can T3 be expected to ensure that lead generators disclose that consumers may not obtain the most-favorable loan terms, much less "to match consumers with the best loan for their needs[,]" as the Bureau suggests. AC, ¶¶ 25, 63. Even lenders cannot be penalized for claiming that their loans are "the 'best available' to . . . or 'ideal' for" a borrower, or for failing to ensure that a loan is suitable for a borrower. *See, e.g.*, *In re Countrywide*, 601 F. Supp. 2d at 1217; *Sheets v. DHI Mortgage Co.*, No. CV F 09-1030-LJO-DLB, 2009 WL 2171085, at *4 (E.D. Cal. July 20, 2009).

T3 also could not have anticipated that it could be taking "unreasonable advantage" of any consumers' "lack of understanding of the material terms" of the loans they freely applied for and received. Selling leads based primarily on the price the

lenders are willing to pay—a commercially reasonable and undeniably common practice—does not take "unreasonable advantage" of consumers. AC, ¶¶ 17, 25.  And, as the Complaint acknowledges, T3's ping tree automatically redirects consumers to lenders' websites that provide lengthy disclosures revealing the material terms of the offered loans.  *Id.*, ¶¶ 63, 65.  T3 cannot have expected any of the alleged misrepresentations would "decrease the likelihood that consumers [would] read the lengthy disclosures on a lender's webpage."  *Id.*, ¶ 64.  "When an advertiser claims his store [] has the 'lowest' prices or his product is the 'best,' no one expects that consumers will take his claims at face-value. . . ."  *In re Countrywide*, 601 F. Supp. 2d at 1217 (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 160 (2d Cir. 2007)).  Consumers, like any contracting party, have the duty to understand the obligations they are assuming.  *IFC Credit*, 543 F. Supp. 2d at 946.  And even reliance on sales representations does not relieve consumers "of the obligation to read the contracts to learn what they [are] agreeing to."  *Id.* at 947.

Applying the CFPA to deem T3's conduct "abusive" under these circumstances would violate Defendants' due process right to fair notice and render the statute unconstitutionally vague *as applied* to Defendants.

## III.   THE BUREAU HAS NOT ADEQUATELY ALLEGED A VIOLATION OF THE CFPA.

The Complaint fails to plead adequate facts to state a plausible claim under the CFPA and should be dismissed for this separate reason.

### A.   The Complaint Fails To Adequately Plead That T3 Engaged In Any Unfair Acts or Practices.

To state a claim for unfairness under the CFPA, the Bureau must allege facts sufficient to show T3's conduct (i) causes or is likely to cause substantial injury to consumers, (ii) the substantial injury to consumers is not reasonably avoidable by consumers, and (iii) the substantial injury to consumers is not outweighed by

countervailing benefits to consumers.[8]  12 U.S.C. § 5531(c)(1).  The Bureau does not and cannot plead facts sufficient to satisfy this test for three reasons.

First, the premise underlying the Bureau's unfairness claim—that T3 is required to vet and monitor the conduct of the independent lead generators and lead purchasers with which it does business—fails as a matter of law.  As discussed above, existing law does not impose such a duty on T3, or any service provider under the CFPA.  Nor has the Bureau identified the level or type of monitoring that would satisfy its undefined standard.  The Bureau, notably, does not assert that T3 does no due diligence on its contracting partners.  Instead, the Bureau simply asserts, without any factual support, that what T3 does is ineffective.  AC, ¶¶ 19, 37.  The Bureau's theory, taken to its logical conclusion, would require T3 to conduct ongoing and constant monitoring of, inter alia, its lead generators' websites, every state banking regulator's website, and every purchaser (and downstream purchaser) of its leads.  There is simply no basis in the law to impose such a duty now, nor to penalize Defendants for having failed to previously undertake this unbounded and endless task.

Second, the Bureau has not pled facts sufficient to show that T3's conduct "causes or is likely to cause consumers substantial injury" and thus could satisfy the first prong of the unfairness test.  As an initial matter, the Complaint does not plausibly allege *any* substantial injury consumers are likely to suffer as a result of T3's conduct.  Moreover, even if T3's conduct were likely to expose consumers to unlawful conduct, it cannot be assumed that consumers are likely to be injured as a result.  Consumers cannot be injured by representations they do not rely upon, or that no reasonable consumer can be expected to rely upon.  *In re Countrywide*, 601 F. Supp. 2d at 1217.  Lenders also are not required to offer the lowest or best interest rate, *id.*, and thus consumers cannot suffer any legally cognizable injury as a result of their not doing so.  Nor does the Complaint allege facts supporting its suggestion that consumers who might qualify for

---

[8] The standard for unfairness in the CFPA follows the same three-part test as the Fair Trade Commission Act.  *ITT Educ. Servs.*, 2015 WL 1013508, at *17.

loans from offshore or tribal lenders could actually obtain loans with better rates or lower fees from another source. AC, ¶ 33. And as the Bureau acknowledges, if loans are void under state law, "lenders will have no legal right to collect" on them. *Id.*, ¶ 28.

The Complaint also fails to adequately allege any unlawful conduct to which T3 purportedly exposes consumers. For example, even if any of the alleged misrepresentations were unlawful, the Complaint does not identify who made them, when, where, or how they were made. *See, e.g., id.*, ¶¶ 21-23; *Davis v. Chase Bank U.S.A., N.A.*, 650 F. Supp. 2d 1073, 1089–90 (C.D. Cal. 2009) (Rule 9(b) applies "to any allegations of fraudulent conduct, even when none of the claims in the complaint 'sound in fraud'") (citing *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1102–06 (9th Cir. 2003)); *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985). Without facts identifying who made the alleged misrepresentations, when they were made, or how long they were posted on any websites, the Court cannot possibly infer that any consumers relied, or are likely to rely, upon them, much less connect the statements to any leads T3 sold, any loans actually issued, or any "substantial injury" consumers are likely to suffer as a result. *Ambrose v. Coffey*, 696 F. Supp. 2d 1119, 1136 n.13 (E.D. Cal. 2010) (plaintiffs must plead plausible allegations that defendants' actions caused injuries); *Tashiro-Townley v. Bank of N.Y. Mellon*, No. C10-1720-JCC, 2016 WL 3551810, at *3 (W.D. Wash. June 30, 2016) (plaintiffs failed to "plead sufficient facts to establish causation between Defendants' unfair or deceptive acts and their injury").

The Bureau, likewise, fails to plausibly allege that T3's conduct exposes consumers to unlawful conduct of any lenders or other lead purchasers, or that T3 knew or should have known its conduct was likely to do so. The Bureau's bare legal conclusions do not suffice. AC, Intro., ¶¶ 19, 27-28; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Complaint only identifies two lenders with which T3 did business while the lenders were subject to cease-and-desist orders in certain states, Northway

Financial Corp., Ltd. ("Northway") and Joro Resources LTD ("Joro").[9]  AC, ¶ 41.  But the Complaint does not allege T3 knew or even should have known the two lenders were subject to such orders.  *Id*.  Nor does the Bureau assert any facts from which the Court could reasonably infer that by continuing to send these lenders leads, T3 was likely to cause consumers substantial injury.  Indeed, the Complaint does not allege that T3 actually forwarded any leads to Northway for consumers residing in the states that had issued such orders.  *Id*.  Nor does the Bureau plead that either lender has issued or continues to issue any loans in the subject states based on leads from T3, that the lenders are still subject to any cease-and-desist orders, or that T3 continues to do business with either lender.  *Id*.  In short, without facts connecting T3 to any currently unlawful conduct, the Complaint "stops short of the line between possibility and plausibility" that T3's conduct is likely to cause consumers substantial injury.  *Iqbal*, 556 U.S. at 678.

Finally, the Complaint fails to adequately plead that any substantial injury that consumers could possibly suffer as a result of T3's conduct is not reasonably avoidable by consumers or outweighed by countervailing benefits to consumers, and thus could satisfy the second and third prongs of the unfairness test.  The only paragraphs of the Complaint that mention these prongs simply recite the statute's requirements.  AC, ¶¶ 45, 52.  The Bureau cannot cure this defect by amendment.  As discussed above, consumers are required by law to review and understand the material terms of their loan agreements, can research the legal status of any lenders to which they are directed, and can comparison shop for borrowing alternatives.

Count I of the Complaint should be dismissed with prejudice.

**B.   The Complaint Fails To Adequately Plead That T3 Engaged In Any Abusive Acts Or Practices.**

A claim for abuse under the CFPA must allege facts sufficient to show T3's conduct (i) "takes unreasonable advantage" (ii) "of a lack of understanding on the part

---

[9]  The Bureau's conclusory allegations that other unidentified lead purchasers in T3's network violate state usury laws do not suffice.  AC ¶¶ Intro., 27-28, 33-35, 37.

of the consumer of the material risks, costs, or conditions of the product or service."  12

U.S.C. § 5531(d)(2)(A).  The Complaint does not, and cannot be amended to, state a

plausible claim under this standard.

This claim, like the unfairness claim, fails because its underlying premise—that

T3 was required to undertake still unidentified steps to effectively vet and monitor the

independent third parties with which it does business—has no basis in existing law.  But

even if T3 could be required to "effectively vet and monitor" the practices of its lead

generators and lenders, T3's alleged failure to do so cannot be said to take unreasonable

advantage of any consumers' lack of understanding of the terms of their loans.  As

discussed above, consumers have the duty to read and understand the contracts they

sign, and any representations made in the sales process do not relieve them of this duty.

*IFC Credit*, 543 F. Supp. 2d at 946-47.  And because lenders are not required to offer

consumers the most appropriate or best loan terms, T3 certainly cannot be required to

ensure that they do.  *See, e.g.*, *Sheets*, 2009 WL 2171085, at *4.  The Bureau simply

does not and cannot plead a plausible claim for abuse against T3.

### C.   The Complaint Fails To Allege Facts Sufficient To Support Section 5536(a)(3) Claims Against The Individual Defendants.

The Bureau seeks to hold the Demirchyans liable under 12 U.S.C. § 5536(a)(3),

alleging that the Demirchyans "knowingly or recklessly provided substantial assistance

to T3, a service provider engaged in unfair acts and practices" by reason of their alleged

"significant responsibility for establishing T3's policies and practices, and . . .

substantial control over T3's operations."  AC, ¶¶ 54-57, 68-71 (citing 12 U.S.C. §

5536(a)(3)).  Because the Bureau does not and cannot plead any unfair or abusive acts

or practices of T3, the Demirchyans cannot possibly have knowingly or recklessly

substantially assisted T3 in doing so, when they had no reason to know T3's alleged

conduct could be deemed unfair or abusive.  The allegations against the Demirchyans

are insufficient to impose individual liability under the CFPA for the additional reason

that it does not allege the Demirchyans (i) acted knowingly or recklessly or (ii)

substantially assisted T3 in performing unfair acts and practices.

        1.    <u>The Complaint does not plausibly allege that the Demirchyans acted knowingly or recklessly.</u>

Other than a conclusory allegation that the Demirchyans "knowingly . . . provided substantial assistance to T3[,]" the Bureau does not allege any fact indicating that the Demirchyans *actually knew* about any allegedly unfair or abusive acts or practices.  AC, ¶¶ 55, 57, 69, 71.  Such a bare legal conclusion, without any supporting factual allegations, is insufficient to state a claim.  *Iqbal*, 556 U.S. at 678; *U.S., ex rel. Modglin v. DJO Glob. Inc.*, 114 F. Supp. 3d 993, 1012 (C.D. Cal. 2015); *Amini Innovation Corp. v. KTY Int'l Mktg.*, 768 F. Supp. 2d 1049, 1054–55 (C.D. Cal. 2011).

The allegations in the Complaint are likewise insufficient to state a claim against the Demirchyans under a recklessness standard.  Although Defendants are not aware of any published decisions addressing section 5536(a)(3)'s scienter requirements,[10] the Securities and Exchange Act of 1934 ( "Exchange Act") uses a similar standard: "[A]ny person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this chapter . . . shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided."  15 U.S.C. § 78t(e).

Courts interpreting 15 U.S.C. § 78t(e) have held that reckless conduct is "at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"  *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978) (quoting *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir. 1977)); *see also Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1010 (11th Cir. 1985).  Although the Ninth Circuit has

---

[10] Defendants are aware of one unpublished decision addressing the issue, *Consumer Financial Protection Bureau v. Universal Debt & Payment Solutions, LLC, et al.*, Case No. 1:15-CV-0859-RWS (Sept. 1, 2015 N.D. Ga.).  There, in determining whether the defendant's conduct was reckless under 12 U.S.C. § 5536(a)(3), the court adopted the standard applied under 15 U.S.C. § 78t(e), discussed below.

not addressed the standard for reckless conduct under 15 U.S.C. § 78t(e), it has applied a similar standard for claims under Section 10(b) of the Exchange Act: "[Reckless conduct is] a highly unreasonable [action], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990).

Thus, to establish that the Demirchyans recklessly assisted T3, the Bureau must allege that the Demirchyans' actions were highly unreasonable, amounting to an extreme departure from the standards of ordinary care, and that the danger of T3's allegedly unfair and abusive acts and practices was so obvious that the Demirchyans must have been aware of it. The Bureau has not even attempted to do so. Instead, the Bureau simply alleges—without any factual support—that the Demirchyans "recklessly . . . provided substantial assistance to T3, a service provider engaged in unfair acts and practices . . . ." AC, ¶¶ 55, 57, 69, 71. This "formulaic recitation of the elements of [the] cause of action" is not enough. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990).

The minimal factual allegations in the Complaint do not suggest that the Demirchyans acted recklessly. The only allegations in the Complaint identifying the Demirchyans' conduct with any specificity are that since 2014,[11] the Demirchyans (i) "have had authority and responsibility to decide whether to accept any lead generator or purchaser into or remove them from T3's network" and (ii) "have shared responsibility for deciding the position of each purchaser in the ping tree and designing T3's systems to filter and sell applications in the manner most profitable to T3, without regard for the practices of lead generators or purchasers." AC, ¶¶ 15, 17. Neither allegation suggests

---

[11] To the extent the Bureau's claims are based on any conduct by the Demirchyans before 2014, the claims must be dismissed because the Bureau has not identified *any* actions to support its aiding and abetting claims before 2014.

22

that the Demirchyans' conduct was so "highly unreasonable" that the conduct represents an "extreme departure from the standards of ordinary care." Indeed, nothing in the Complaint suggests that the Demirchyans were or should have been aware that T3's alleged conduct could later be deemed to be unfair or deceptive or that the Demirchyans' actions aided in T3's alleged misconduct in any way. To the contrary, the allegations indicate only that the Demirchyans made routine and commonplace business decisions in the ordinary course of T3's business. Such allegations are insufficient as a matter of law. *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 95, 97 (5th Cir. 1975).

2.   The Complaint does not plausibly allege that the Demirchyans substantially assisted T3.

Defendants are not aware of any published decisions interpreting 12 U.S.C. § 5536(a)(3)'s prohibition against providing "substantial assistance" to a covered person or service provider's unfair, deceptive, or abusive act or practice. As with the statute's scienter requirement, cases addressing the meaning of "substantial assistance" under the Exchange Act provide helpful guidance in understanding the term.

"[T]o constitute 'substantial assistance,' the assistance must be such that it is a substantial factor in causing the resulting violation. There must be a substantial causal connection between the culpable conduct of the alleged aider and abettor and the harm[.]" *Camp v. Dema*, 948 F.2d 455, 460 (8th Cir. 1991); *Mendelsohn v. Capital Underwriters, Inc.*, 490 F. Supp. 1069, 1084 (N.D. Cal. 1979). The Complaint alleges that the Demirchyans provided "substantial assistance" to T3, but does not identify any facts explaining how the Demirchyans assisted T3 with or contributed to the allegedly unfair conduct. The Bureau alleges that Grigor Demirchyan is the President, Chief Executive Officer, Chief Financial Officer and sole director of T3, and that Marina Demirchyan is T3's Vice President and provides accounting services. AC, ¶¶ 6, 7. It also generally alleges that the Demirchyans have "substantial control over and involvement in the establishment of T3's business policies and practices." *Id.* But neither the Demirchyans' positions in the company nor their alleged control over T3's

business policies and practices is sufficient to show that they substantially assisted in the underlying misconduct in violation of section 5536(a)(3). *Durham v. Kelly*, 810 F.2d 1500, 1505 (9th Cir. 1987) ("It would be absurd to hold [a corporate officer] responsible as an aider and abetter without proof of scienter merely because she was a director of a corporation [that] may have been guilty of violations of the Exchange Act.").

Nor does the Bureau allege that either of the Demirchyans was in any way involved in or even aware of the conduct that underlies its claims against T3. The only specific allegations with respect to the Demirchyans' conduct (that they have authority over which lead generators or purchasers to include in T3's network and somehow decide the position of purchasers in T3's automated ping tree) do not suggest that the Demirchyans actually assisted T3 in or caused the conduct of which the Bureau complains: T3's alleged failure to prevent lead generators from making misleading statements or lenders from engaging in illegal activity. AC, ¶¶ 15, 17. Because the Complaint fails to allege any substantial assistance by the Demirchyans, the claims against them should be dismissed.

## IV.   THE BUREAU CANNOT RECOVER THE RELIEF IT SEEKS.

The Bureau is not entitled to restitution, penalties, or fees, and thus their claims for these items of relief must be dismissed. *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1170 (C.D. Cal. 2011) (citing *Whittlestone, Inc. v. Handi–Craft Co.*, 618 F.3d 970, 974–75 (9th Cir. 2010).

First, the Bureau cannot recover restitution. AC, Prayer for Relief. The Bureau does not allege that any consumers have actually suffered injury as a result of T3's conduct. AC, ¶ 51 ("T3's conduct is likely to cause substantial injury to consumers."). The Bureau cannot recover for injuries where no harm has been alleged.

Second, the Bureau's allegations do not entitle it to penalties. AC, Prayer for Relief. The Court can award penalties for violations of the CFPA as follows: (1) up to $5,000 per day for "any violation of a law, rule, or final order or condition imposed in writing by the Bureau"; (2) up to $25,000 per day for reckless violations; and (3) up to

$1,000,000 per day for knowing violations. 12 U.S.C. § 5565(c)(2).  The Bureau has not pled facts that would support penalties under any of these provisions.  As discussed in detail above, Defendants' conduct did not violate any law, rule, or final order or condition imposed in writing by the Bureau.  Even if there were such a violation, penalties should be limited to $5,000 per day, as the Bureau has not alleged that T3 recklessly or knowingly violated the CFPA, and the allegations that the Demirchyans acted knowingly or recklessly are inadequate as a matter of law.

<u>Finally</u>, the Bureau cannot recover attorneys' fees.  AC, Prayer for Relief (seeking "Plaintiff's costs and fees[.]").  Assuming the Bureau's reference to "fees" includes attorneys' fees, the Bureau is not entitled to such an award.  "[E]ach party in a lawsuit ordinarily shall bear its own attorney's fees unless there is express statutory authorization to the contrary."  *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983).  "Congress has usually been explicit when it wants costs to include attorney's fees." *Castillo Grand, LLC v. Sheraton Operating Corp.*, 719 F.3d 120, 123 (2d Cir. 2013); *see, e.g.,* 12 U.S.C. § 5538(b)(7); 15 U.S.C. § 78r.  Here, 12 U.S.C. § 5565(b) entitles the Bureau to recover its costs, but does not entitle the Bureau to recover fees. Accordingly, the Bureau's request for attorneys' fees should be dismissed.

## V.    CONCLUSION

The fatal flaws in the Complaint cannot be remedied by amendment.  *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013).  Defendants comprehensively outlined the deficiencies in the Bureau's claims in their multiple meet and confer conferences, and the Bureau has already had two opportunities to try to cure them.  It should not be given a third bite at the apple.  The Complaint should be dismissed with prejudice.

Dated:  August 1, 2016                    AKIN GUMP STRAUSS HAUER & FELD LLP


By  _/s/ Ashley Vinson Crawford_
              Ashley Vinson Crawford
              Danielle C. Ginty
Attorneys for Defendants D and D Marketing,
Inc., d/b/a T3Leads, Grigor Demirchyan, and
Marina Demirchyan