KARA K. MILLER (*pro hac vice*)
Email: kara.miller@cfpb.gov
MEGHAN SHERMAN CATER (*pro hac vice*)
Email: meghan.sherman@cfpb.gov
BARRY REIFERSON (*pro hac vice*)
Email: barry.reiferson@cfpb.gov
LEANNE E. HARTMANN, CA Bar #264787
Email: leanne.hartmann@cfpb.gov
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Telephone: (202) 435-7825
Facsimile: (202) 435-7329
KENT A. KAWAKAMI, CA Bar #149803
Email: kent.kawakami@usdoj.gov
Local Counsel
United States Attorney's Office
Central District of California – Civil Division
300 North Los Angeles Street, Room 7516
Los Angeles, CA 90012
Telephone: (213) 894-4858
Facsimile: (213) 894-2380
Attorneys for Plaintiff
Consumer Financial Protection Bureau

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

Consumer Financial Protection Bureau,

Plaintiff,

v.

D and D Marketing, Inc., d/b/a T3Leads, *et al.*,

Defendants.

Case No. 2:15-cv-9692-PSG(Ex)

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Date: November 7, 2016
Time: 1:30 p.m.
Court: Hon. Philip S. Gutierrez
Courtroom 880 – Roybal

# TABLE OF CONTENTS


TABLE OF AUTHORITIES………………..………………………………………… iii

INTRODUCTION…………………………………….……………………….. 1

ARGUMENT………………………………………………………………….. 2

I. T3Leads is a service provider under the CFPA…………………………… 2

II. The CFPA provides fair notice of the conduct it prohibits………………... 4

III. The Amended Complaints state claims for relief…………………………9

A. The Bureau adequately alleges that T3 engages in unfair and abusive acts or practices…………………………………………………….. 10

B. The Bureau adequately alleges that the Demirchyans and Gasparyan provide substantial assistance to T3's violations……...………………….. 13

IV. The requested relief is available as a matter of law……………………… 20

V. T3's lead generators and lenders are not indispensable parties…………... 21

VI. The Bureau's claims are not time-barred……………………………….22

VII. The Bureau's structure is not unconstitutional…….…………………… 23

CONCLUSION……………………………………………………………….. 24

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 9

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 9

*Bonilla v. Oakland Scavenger Co.*,
697 F.2d 1297, 1301 (9th Cir. 1982) ........ 6

*Butler v. L.A. County*,
2013 WL 8291425 (C.D. Cal. Oct. 11, 2013) ........ 23

*Callan v. N.Y. Cmty. Bank*,
643 Fed. Appx. 666 (9th Cir. 2016) ........ 17

*CFPB v. CashCall, Inc.*, CV 15-7522-JFW (RAOx),
2016 WL 4820635 (C.D. Cal. Aug. 31, 2016) ........ 7, 8, 23

*CFPB v. ITT Educ. Servs., Inc.*,
— F. Supp. 3d —, 2015 WL 1013508 (S.D. Ind. Mar. 6, 2015) ........ 8, 23

*CFPB v. Morgan Drexen, Inc.*,
60 F. Supp. 3d 1082 (C.D. Cal. 2014) ........ 23

*Chicago Male Med. Clinic, LLC v. Ultimate Mgmt.*,
2014 WL 7180549 (C.D. Cal. Dec. 16, 2014) ........ 13

*Consumer Health Benefits Ass'n*,
2011 WL 3652248 (E.D.N.Y. Aug. 18, 2011) ........ 18

*Davis v. HSBC Bank Nevada N.A.*,
691 F.3d 1152 (9th Cir. 2012) ........ 11

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976) ........ 14

*Farmer v. Brennan*,
511 U.S. 825 (1994)........................................................................ 14

*FCC v. Fox Television Stations, Inc.*,
— U.S. —, 132 S. Ct. 2307 (2012) ............................................................ 8

*Forest Ambulatory Surgical Assocs. v. United Healthcare Ins. Co.*, CV 12-2916
PSG (FFMx), 2014 WL 11396254 (C.D. Cal. May 30, 2014) ............................ 10

*FTC v. Chapman*,
714 F.3d 1211 (10th Cir. 2013) ........................................................... 18

*FTC v. Lake*, No. SACV 15-00585-CJC(JPRx), 2016 U.S. Dist. LEXIS 24821,
2016 WL 1117728 (C.D. Cal. Feb. 24, 2016) ............................................ 18

*FTC v. Neovi, Inc.*,
604 F.3d 1150 (9th Cir. 2010) ............................................................. 11

*FTC v. Network Servs. Depot, Inc.*,
617 F.3d 1127 (9th Cir. 2010) ............................................................. 14

*FTC v. Wyndham Worldwide Corp.*,
799 F.3d 236 (3d Cir. 2015) .............................................................. 7, 9

*Grayned v. City of Rockford*,
408 U.S. 104 (1972)........................................................................... 8

*Hoffman Estates v. Flipside Hoffman Estates, Inc.*,
455 U.S. 489 (1982)........................................................................... 5

*Horsley v. Feldt*,
304 F.3d 1125 (11th Cir. 2002) ........................................................... 23

*In re Toyota Motor Corp.*,
790 F. Supp. 2d 1152 (C.D. Cal. 2011) .................................................. 19

*Makah Indian Tribe v. Verity*,
910 F.2d 555 (9th Cir. 1990) .............................................................. 21

*McLaughlin v. Int'l Ass'n of Machinists*,
847 F.2d 620 (9th Cir.1988) .......... 21

*N.M. State Inv. Council v. Ernst & Young LLP*,
641 F.3d 1089 (9th Cir. 2011) .......... 15

*NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*,
416 U.S. 267 (1974).......... 5

*Northern Alaska Envtl. Ctr. v. Hodel*,
803 F.2d 466 (9th Cir.1986) .......... 21

*Okla. Firefighters Pension & Ret. Sys. v. IXIA*, No. CV 13-08440 MMM (SHx),
2015 WL 1775221 (C.D. Cal. Apr. 14, 2015) .......... 15

*PHH Corp. v. CFPB*, No. 15-1177, ECF No. 1640101 at 10 (D.C. Cir. Oct. 11, 2016) .......... 23

*Police Ret. Sys. v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) .......... 14

*Safeco Ins. Co. of Am. v. Burr*,
551 U.S. 47 (2007).......... 14

*SEC v. Apuzzo*,
689 F.3d 204 (2d Cir. 2012) .......... 18

*SEC v. Chenery Corp.*,
332 U.S. 194 (1947).......... 5

*Swanson v. U.S. Forest Service*,
87 F.3d 339 (9th Cir. 1996) .......... 23

*U.S. ex rel. Air Control Techs., Inc. v. Pre Con Indus., Inc.*,
720 F.3d 1174 (9th Cir. 2013) .......... 22

*United States v. Colon-Arreola*,
753 F.3d 841 (9th Cir. 2014) .......... 14

*United States v. Hancock*,
231 F.3d 557 (9th Cir. 2000) .................... 14

*United States v. Peoni*,
100 F.2d 401 (2d Cir.1938) .................... 18

*United States v. Red Eagle*,
60 Fed. Appx. 155 (9th Cir. 2003) .................... 14

*United States v. Williams*,
553 U.S. 285 (2008).................... 8

*Von Saher v. Norton Simon Museum of Art at Pasadena*,
592 F.3d 954 (9th Cir. 2010) .................... 22

**Statutes**

12 U.S.C. § 5481(15)(A)(i).................... 3

12 U.S.C. § 5481(26)(A).................... 3

12 U.S.C. § 5481(26)(B).................... 3

12 U.S.C. § 5514.................... 4

12 U.S.C. § 5531(a) .................... 6

12 U.S.C. § 5531(c)(1).................... 10

12 U.S.C. § 5531(c)-(d) .................... 4

12 U.S.C. § 5536(a)(1)(B) .................... 4

12 U.S.C. § 5536(a)(3).................... 4, 13, 14

12 U.S.C. § 5564(g) .................... 22

12 U.S.C. §§ 5565(a)(2)(C), (H).................... 20

12 U.S.C. § 5565(b) .................... 20

15 U.S.C. § 1692(a) .......... 8

15 U.S.C. § 45(n) .......... 8

**Rules**

Fed. R. Civ. P. 19(a)(1) .......... 21

Fed. R. Civ. P. 7 .......... 23

Fed. R. Civ. P. 8(a)(2) .......... 9

Fed. R. Civ. P. 10(c) .......... 23

Fed. R. Civ. P. 12(b)(6) .......... 1, 22

**Regulations**

16 C.F.R. 310.4 .......... 8

Telemarketing Sales Rule,
60 Fed. Reg. 43842–01, 43852 (FTC, Aug. 23, 1995) .......... 18

## INTRODUCTION

The Consumer Financial Protection Bureau filed three related actions alleging that: (1) D and D Marketing, Inc., d/b/a T3Leads (T3Leads or T3), violated the Consumer Financial Protection Act of 2010 (CFPA) by engaging in unfair and abusive acts and practices in the sale of consumer-loan applications to small-dollar lenders and others acting unlawfully and in operating a loan-application network that prevented consumers from understanding the material risks, costs, or conditions of their loans, and (2) several of the company's past and current executives—Grigor Demirchyan, Marina Demirchyan, Dmitry Fomichev, and Davit Gasparyan—substantially assisted those violations.[1]

All Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). The Bureau filed its opposition to Fomichev's motion on September 2, 2016.[2] The Bureau's oppositions to separate motions, one filed jointly by T3, Grigor Demirchyan, and Marina Demirchyan and another by Davit Gasparyan, are due on the same day.[3] T3 and the Demirchyans' motion and Gasparyan's motion raise identical arguments with the exception of two arguments made only by Gasparyan. In addition, Gasparyan joins in the arguments made by T3 and the Demirchyans, and T3, the Demirchyans, and Gasparyan all incorporate Fomichev's argument that the Bureau's structure is unconstitutional.[4] For

---

[1] *CFPB v. D and D Marketing, Inc., et al.*, 2:15-cv-9692-PSG(Ex); *CFPB v. Dmitry Fomichev*, 2:16-cv-2724-PSG(Ex); *CFPB v. Davit Gasparyan*, 2:16-cv-2724-PSG(Ex).

[2] *CFPB v. Dmitry Fomichev*, 2:16-cv-2724-PSG(Ex), ECF No. 32.

[3] Oral argument on all three motions is now set for November 7, 2016.

[4] T3 Mem. Supp. Mot. Dismiss, ECF No. 39, at 3 n.1; Gasparyan Mem. Supp. Mot. Dismiss, ECF No. 30, at 8 n.1.

efficiency, the Bureau responds to T3 and Demirchyans' motion and Gasparyan's motion in this consolidated brief, which it files in each case.

## ARGUMENT

The Bureau brought these actions to hold Defendants liable for the roles they played in exposing consumers to the risk of harm. In their attempt to escape liability for their unlawful conduct, Defendants take the kitchen-sink approach, advancing several unavailing arguments. First, Defendants argue that the Bureau lacks authority to bring these actions because T3 is not a "service provider" under the CFPA. Second, Defendants argue that the CFPA, as applied to them, is unconstitutionally vague because it failed to apprise them that their conduct might be unlawful. Third, Defendants argue that the Bureau has failed to state a claim. Fourth, Defendants argue that the requested relief is not available under the CFPA. Fifth, Gasparyan argues that dismissal is required because the Bureau has failed to join indispensable parties. Sixth, Gasparyan argues that the Bureau's claims are barred by the applicable statute of limitations. Finally, Defendants argue that these actions must be dismissed because the Bureau's structure is unconstitutional.

As explained below, Defendants are wrong on all fronts; none of their arguments justifies dismissal of the Bureau's claims. The Court should therefore deny the motions to dismiss.

### I. T3Leads is a service provider under the CFPA.

Defendants argue that the Bureau lacks authority to bring these actions because T3 is not a "service provider" under the CFPA. T3 and the Demirchyans further argue that, even if T3 is a "service provider," the Bureau's authority does not reach its conduct. Both arguments fail.

T3's integral role in consumer lending, specifically in processing and selling consumer-loan applications to small-dollar lenders, demonstrates that it falls squarely within the definition of "service provider" under the CFPA. A "service

provider" is "any person that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service, including a person that . . . processes transactions relating to the consumer financial product or service."[5] The lenders to which T3 sells consumer-loan applications as "leads" are "covered persons"—they extend credit and service small-dollar loans.[6] T3 accepts and processes consumer applications for those loans.[7] T3 thus "process[es] transactions" for covered persons, which brings it within the CFPA's definition of "service provider."

The CFPA excludes from the definition of "service provider" a person who solely provides "a support service of a type provided to businesses generally or a similar ministerial service" or "time or space for an advertisement for a consumer financial product or service through . . . electronic media."[8] This exclusion does not apply to T3's conduct. T3 plays an essential role in processing consumer-loan applications. T3 exercises judgment and discretion in filtering applications through what it calls a "ping tree," and its conduct goes well beyond a ministerial service or the offering of time or space for advertising.[9]

Through its ping tree, T3—not its lead generators or purchasers—chooses which applications are directed to which lenders, and it does so based on its own financial interests, using feedback from its purchasers to provide its highest-paying

---

[5] 12 U.S.C. § 5481(26)(A).

[6] 12 U.S.C. § 5481(15)(A)(i); Am Compl., ECF No. 37, ¶ 12.

[7] T3 Am Compl., ECF No. 37, ¶¶ 8-12, 38; Gasparyan Am. Compl., ECF No. 30, ¶¶ 10-14, 40.

[8] 12 U.S.C. § 5481(26)(B).

[9] T3 Am Compl., ECF No. 37, ¶¶ 16-17. *See* T3 Mem. Supp. Mot. Dismiss, ECF No. 39, at 6 (quoting Black's Law Dictionary (10th ed. 2014)) ("A 'ministerial service' is 'an act that involves obedience to instructions or laws instead of discretion, judgment, or skill.'").

purchasers with the most valuable applications.[10] The service T3 provides is not comparable to the types of services provided to businesses generally, such as office cleaning; it is uniquely tailored to the needs of small-dollar lenders and is critical to the consummation of online consumer loans.

T3 and the Demirchyans further argue that even if T3 is a "service provider," the Bureau's authority is limited by § 1024 of the CFPA.[11] Section 1024 governs the Bureau's *supervisory* authority over non-depository institutions and allows for supervision of a certain subset of covered persons and their service providers; it in no way limits the Bureau's *enforcement* authority over covered persons or service providers.[12] The argument by T3 and the Demirchyans is contrary to the plain language of the statute and is simply wrong.

## II. The CFPA provides fair notice of the conduct it prohibits.

Defendants argue that the CFPA is unconstitutionally vague as applied to them because the Bureau's allegations of unfair and abusive conduct have been "set forth for the first time in this enforcement action."[13] But the CFPA is explicit in its prohibition of unfair and abusive acts and practices, and the statute itself sets forth the elements of both claims.[14] Defendants have therefore had notice of the elements of prohibited conduct since at least July 21, 2010, the date the CFPA became law.

---

[10] T3 Am Compl., ECF No. 37, ¶¶ 16, 25, 38.

[11] T3 Mem. Supp. Mot. Dismiss, ECF No. 39, at 7-8 (citing 12 U.S.C. § 5514).

[12] 12 U.S.C. § 5514.

[13] T3 Mem. Supp. Mot. Dismiss, ECF No. 39, at 9. *See also* Gasparyan Mem. Supp. Mot. Dismiss, ECF No. 31, at 4 ("[T]he CFPB cannot use the complaint as the first notice to Gasparyan of the new duties the CFPB seeks to create.")

[14] 12 U.S.C. §§ 5531(c)-(d), 5536(a)(1)(B), 5536(a)(3).

Further, "economic regulation," such as the CFPA, "is subject to a less strict vagueness test . . . because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action."[15] Notably, T3 demonstrated at least some awareness of its obligation to consult the law "in advance of action": in 2013, T3 developed a "Lender Audit Questionnaire" that it sent to prospective purchasers of its services to help determine whether they were complying with the relevant laws.[16]

Despite the law being in force and known to Defendants since 2010, Defendants assert that agency rulemaking is required to provide fair notice of the prohibited conduct before the Bureau can enforce the CFPA's bans on unfair and abusive acts.[17] This argument is contradicted by the very cases Defendants cite to support their position, and it must be rejected. "There is . . . a very definite place for the case-by-case evolution of statutory standards. And the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency."[18]

Focusing more specifically on T3's role as a service provider, T3 and the Demirchyans claim ignorance of "any case law, statute, regulation, rule, or other agency guidance that requires any service provider to 'vet and monitor' the conduct of the third parties with which they do business."[19] Similarly, Gasparyan

---

[15] *Hoffman Estates v. Flipside Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982).

[16] T3 Am. Compl., ECF No. 37, ¶ 37; Gasparyan Am. Compl., ECF No. 30, ¶ 39.

[17] T3 Mem. Supp. Mot. Dismiss, ECF No. 39, at 9; Gasparyan Mem. Supp. Mot. Dismiss, ECF No. 31, at 3 ("The complaint [] ignores the mandate to create rules *in advance of filing a suit*, so as to notice [sic] to the regulated parties by way of the promulgation of a rule.").

[18] *SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947) (quoted in *NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 293 (1974)).

[19] T3 Mem. Supp. Mot. Dismiss, ECF No. 39, at 10.

argues that "[t]he very first time Gasparyan heard of the duties alleged in the complaint or was placed on notice of the alleged duties was at the time of the filing of the complaint long after the activity alleged against him occurred."[20] But the CFPA is plain in prohibiting service providers from conducting their business in a manner that is unfair or abusive to consumers.[21] And T3 and the Demirchyans themselves ask the Court to take judicial notice of agency guidance that puts the industry on notice that companies must monitor their relationships with third parties for compliance with consumer-financial law.[22]

Defendants claim that T3could not be expected "to anticipate that failing to effectively vet and monitor the lenders with which T3 worked could cause consumers substantial injury" [23] or "to police and prevent conduct that it does not

---

[20] Gasparyan Mem. Supp. Mot. Dismiss, ECF No. 30, at 6.

[21] 12 U.S.C. § 5531(a) ("The Bureau may take any action authorized under subtitle E to prevent a covered person *or service provider* from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service.") (emphasis added).

[22] T3 Req. Judicial Notice, ECF No. 39-1; Ex. A, CFPB Bulletin 2012-03 (Apr. 13, 2012), ECF No. 39-2 at 3 ("A service provider that is unfamiliar with the legal requirements applicable to the products or services being offered, or that does not make efforts to implement those requirements carefully and effectively, or that exhibits weak internal controls, *can harm consumers and create potential liabilities for* both *the service provider* and the entity with which it has a business relationship." (emphasis added)); Ex. B, CFPB Examination Procedures, Short-Term, Small-Dollar Lending (Sept. 2013), ECF No. 39-3 at 8-9 (Module 1– Marketing, Lead Generation) and 19-20 (Module 5 – Service Provider Relationships). T3 and the Demirchyans suggest that the focus of the agency guidance on the duties of covered persons, rather than service providers, justifies an inference that service providers were without notice. Such an inference is not justified here, based on the plain language of the statute, and in any event would be impermissible at this stage. *Bonilla v. Oakland Scavenger Co.*, 697 F.2d 1297, 1301 (9th Cir. 1982) (stating that court may not consider matters extraneous to the pleadings without conversion to summary judgment).

[23] T3 Mem. Supp. Mot. Dismiss, ECF No. 39, at 13.

know is unlawful."[24] The Amended Complaints allege that T3 knew of scams involving purchased applications[25] and knew or should have known that its applications resulted in void loans or loans on which a lender has no legal right to collect principal, interest, or fees.[26] These facts are fatal to Defendants' arguments, especially in light of a recent decision in this District that held that "servicing and collecting on . . . loans where payments were not due and owing . . . satisfies the requisite elements of a UDAAP violation [(unfair, deceptive, or abusive acts or practices)] under the CFPA."[27] That decision rejected the same argument Defendants make here: that the CFPA does not provide fair notice of this prohibited conduct.[28] Defendants' argument that they could not have known that it would be unlawful to operate a network that enables these practices must also be rejected.

Courts routinely interpret whether specific conduct falls within the prohibitions of a statute; that application of a statute to particular conduct involves such interpretation does not render its prohibitions unconstitutionally vague.[29] Indeed, "most statutes must deal with untold and unforeseen variations in factual situations, and [] practical necessities . . . inevitably limit the specificity with which

---

[24] T3 Mem. Supp. Mot. Dismiss, ECF No. 39, at 15.

[25] T3 Am. Compl., ECF No. 37, at ¶ 36; Gasparyan Am. Compl., ECF No. 30, ¶ 38.

[26] T3 Am. Compl., ECF No. 37, at ¶ 28; Gasparyan Am. Compl., ECF No. 30, ¶ 30.

[27] *CFPB v. CashCall, Inc.*, CV 15-7522-JFW (RAOx), 2016 WL 4820635, at *12 (C.D. Cal. Aug. 31, 2016).

[28] *Id.*

[29] *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 253-54 (3d Cir. 2015) ("The relevant question is not whether Wyndham had fair notice of the FTC's *interpretation* of the statute, but whether Wyndham had fair notice of what the *statute itself* requires.").

legislators can spell out prohibitions."[30] Other courts to evaluate the CFPA's prohibitions on unfair and abusive conduct have rejected Defendants' very argument.[31]

In addition, both "unfair" and "abusive" are terms with established meanings under pre-existing consumer-protection statutes. The CFPA's prohibition of unfair practices is nearly identical to that in the FTC Act.[32] Similarly, the Fair Debt Collection Practices Act states its aim to correct the use of "abusive, deceptive, and unfair debt collection practices."[33] And the Telemarketing Sales Rule forbids "abusive telemarketing acts or practices."[34] Particularly given that Congress used familiar language in enacting the CFPA, the statute provides notice of prohibited conduct with at least the minimal clarity that the Due Process Clause requires.[35] Defendants do not show that the CFPA '"fails to provide a person of ordinary intelligence fair notice of what is prohibited.'"[36]

---

[30] *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972). *See also CFPB v. ITT Educ. Servs., Inc.*, — F. Supp. 3d —, 2015 WL 1013508, at *18 (S.D. Ind. Mar. 6, 2015) (evaluating the CFPA's prohibitions on unfair and abusive conduct and recognizing that "Congress's charter for an agency could not, and should not, use descriptions so precise that they foreclose any interpretive uncertainty.").

[31] *CFPB v. CashCall, Inc.*, CV 15-7522-JFW (RAOx), 2016 WL 4820635, at *12 (C.D. Cal. Aug. 31, 2016); *CFPB v. ITT Educ. Servs., Inc.*, — F. Supp. 3d —, 2015 WL 1013508, at *20 (S.D. Ind. Mar. 6, 2015).

[32] 15 U.S.C. § 45(n).

[33] 15 U.S.C. § 1692(a).

[34] 16 C.F.R. 310.4.

[35] *CFPB v. CashCall, Inc.*, CV 15-7522-JFW (RAOx), 2016 WL 4820635, at *12 (C.D. Cal. Aug. 31, 2016) (citing *CFPB v. ITT Educ. Servs., Inc.*, — F. Supp. 3d —, 2015 WL 1013508, at *20 (S.D. Ind. Mar. 6, 2015) (noting that the CFPA's legislative history suggests that the definition of abusive conduct was intended to be even more flexible and expansive than the definition of unfair conduct.)).

[36] *FCC v. Fox Television Stations, Inc.*, — U.S. —, 132 S. Ct. 2307 (2012) (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).

**III. The Amended Complaints state claims for relief.**

T3 and the Demirchyans dispute the sufficiency of the Amended Complaint on two bases: (1) that the claims fail as a matter of law; and (2) that the Bureau's factual allegations are inadequate; specifically, that the Amended Complaint does not show that T3 engaged in unfair and abusive acts or practices or that the Demirchyans acted knowingly or recklessly or that they provided substantial assistance to T3. The first argument fails for the reasons explained above: the CFPA provides the elements of the claims alleged, the statute provided fair notice of the prohibited conduct, and the fact that courts may interpret whether specific conduct falls within the prohibitions of the statute does not render those prohibitions unlawful.[37] The second argument also fails. The Bureau's claims are alleged with sufficient factual support for the Court, accepting the facts as true, to infer liability.

Gasparyan argues that the Amended Complaint against him inadequately alleges knowledge or recklessness and that it lacks sufficient detail to demonstrate a causal connection between Gasparyan's role and the harm alleged. Gasparyan's arguments likewise fail.

"[A] short and plain statement of the claim[s] showing that the pleader is entitled to relief" will suffice to survive a motion to dismiss.[38] This standard "does not require 'detailed factual allegations.'"[39] "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'"[40]

---

[37] *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 253-54 (3d Cir. 2015).

[38] Fed. R. Civ. P. 8(a)(2).

[39] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[40] *Id.*

Plausibility is determined by the court after first "accept[ing] as true all non-conclusory, factual allegations" and drawing all reasonable inferences based on the factual allegations in favor of the plaintiff.[41] Plausibility requires "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[42]

### A. The Bureau adequately alleges that T3 engages in unfair and abusive acts or practices.

An act or practice is unfair if it causes or is likely to cause substantial injury to consumers that is not reasonably avoidable by consumers and is not outweighed by countervailing benefits to consumers or to competition.[43] T3 and the Demirchyans argue that the Amended Complaint fails adequately to allege the elements of substantial injury and reasonable avoidability by consumers. They are wrong.

The Bureau alleges that T3 knows or should know that it sells applications likely to result in loans that exceed usury limits established by a consumer's state or otherwise fail to comply with the laws of the consumer's state; that T3 knows or should know that it sells applications where the resulting loan will be void or the lender will have no legal right to collect from the consumer; that T3 sells loan applications without knowing the identity of the ultimate purchasers; and that scams involving applications purchased from lead aggregators are prevalent in the

---

[41] *Forest Ambulatory Surgical Assocs. v. United Healthcare Ins. Co.*, CV 12-2916 PSG (FFMx), 2014 WL 11396254, at *3 (C.D. Cal. May 30, 2014).

[42] *Id.* at 678 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").

[43] 12 U.S.C. § 5531(c)(1).

industry.[44] These facts support the reasonable inference that there is a likelihood of substantial injury to consumers from T3's practices.

"Courts have long held that consumers are injured . . . through the actions of those whose practices facilitate, or contribute to, ill intentioned schemes if the injury was a predictable consequence of those actions."[45] Here, the likelihood of injury is a predictable consequence of the sale of loan applications without investigating the practices of purchasers.

With respect to reasonable avoidability, T3 and the Demirchyans argue that they are absolved because "'[a]n injury is reasonably avoidable if consumers 'have reason to anticipate the impending harm and the means to avoid it,' or if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact.'"[46] This argument ignores in the first instance T3's central role in its network, kept secret from consumers, in which T3 controls participation and the flow of information.[47] The lead-generating websites through which consumers submit loan applications to T3 inform consumers that, among other things, lenders have been evaluated and meet certain standards.[48] There is no way for consumers to anticipate that the statements on the application pages are false. Whether the misleading statements by T3's lead generators are themselves actionable is irrelevant. There is also no way for consumers to know that their loan applications might be sold by T3 to a data manager, data broker, or remarketing

---

[44] T3 Am. Compl., ECF No. 37, ¶¶ 27, 28, 30, 36; Gasparyan Am. Compl., ECF No. 30, ¶¶ 29, 30, 32, 38.

[45] *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1156 (9th Cir. 2010).

[46] T3 Mem. Supp. Mot. Dismiss, ECF No. 39, at 13 (quoting *Davis v. HSBC Bank Nevada N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012)).

[47] *See, e.g.*, T3 Am. Compl., ECF No. 37, ¶¶ 15-17, 39-41, 50, 62- 64.

[48] T3 Am. Compl., ECF No. 37, ¶ 21.

company. Where the end users of those applications are unknown even to T3, there is no way for consumers to anticipate or avoid the risk of injuries to which they might be exposed as a result of that sale. Consumers cannot anticipate the impending harm and are unable to avoid it.

T3 and the Demirchyans also argue that the abusiveness claim fails as a matter of law, asserting that T3 "cannot be said to take unreasonable advantage of any consumers' lack of understanding of the terms of their loans" because consumers "have the duty to read and understand the contracts they sign."[49] But the Bureau alleges that T3's practices prevent consumers from understanding material terms, even if consumers read the disclosures provided on the lender's signature page.[50] T3's process allows lenders to advertise loan terms that differ from the terms of the contracts offered to consumers.[51] Material terms of loans ultimately extended to consumers are not available at the time the consumer submits an application.[52] T3's process allows lenders to receive applications from consumers in states where they have been prohibited from lending.[53] Express representations at the time consumers submit their loan applications tell consumers that they will be protected from usurious interest rates, directed to lenders that comply with state and federal law, and offered the best possible interest rates.[54] When a consumer is directed to the e-signature page of a lender, he or she has no way to know that other lenders might have offered different or more favorable

[49] T3 Mem. Supp. Mot. Dismiss, ECF No. 39, at 20.

[50] T3 Am. Compl., ECF No. 37, ¶¶ 62-66.

[51] T3 Am. Compl., ECF No. 37, ¶ 40.

[52] T3 Am. Compl., ECF No. 37, ¶ 63.

[53] T3 Am. Compl., ECF No. 37, ¶ 41.

[54] T3 Am. Compl., ECF No. 37, ¶ 21, 23.

terms had they considered the consumer's loan application; the advertising by lead generators suggests that the lender to which the consumer is directed offers "the best possible APR and repayment terms."[55] T3's process prevents consumers from making an informed choice about whether to accept a loan and whether there are loans with more favorable terms available to them. The allegations in the Amended Complaint, which must be taken as true, are sufficient to draw an inference that T3 is liable for the abusive misconduct.

**B. The Bureau adequately alleges that the Demirchyans and Gasparyan provide substantial assistance to T3's violations.**

It is unlawful for "any person to knowingly or recklessly provide substantial assistance to a covered person or service provider in violation of the provisions of [§ 5531]."[56] The Demirchyans and Gasparyan argue that the allegations of the Amended Complaints fail plausibly to suggest that they acted "knowingly or recklessly" or that they provided "substantial assistance" to T3's unfair and abusive acts or practices.

Defendants improperly conflate the standard relevant to their conduct, which is the "knowingly or recklessly" standard found in 12 U.S.C. § 5536(a)(3), with a higher "scienter" standard, which requires willful violations of law. Defendants' conduct meets the applicable standard and, indeed, cannot be adjudged at this stage to fall outside even the higher standard defendants would have the Court apply. A civil defendant acts knowingly where he has "knowledge of the facts, acts or transactions constituting the alleged violation."[57] The Ninth Circuit makes a clear

---

[55] T3 Am. Compl., ECF No. 37, ¶¶ 23, 63.

[56] 12 U.S.C. § 5536(a)(3).

[57] *Chicago Male Med. Clinic, LLC v. Ultimate Mgmt.*, 2014 WL 7180549, at *9 (C.D. Cal. Dec. 16, 2014).

distinction between this knowledge standard and the Defendants' proposed "scienter" standard, which is that of willfulness or, synonymously, intent.[58] Knowledge refers to knowledge of the conduct "rather than knowledge of the legal consequences."[59] Knowledge of legal consequences is the heightened standard of willfulness.[60] Under a plain reading of § 5536(a)(3), the applicable knowledge standard is whether Defendants had knowledge of the facts, acts, or transactions constituting the alleged violation.

A civil defendant acts recklessly where he violates "an objective standard: action entailing an unjustifiably high risk of harm that is either known or so obvious that it should be known."[61] This differs from a criminal standard which uses a subjective test.[62] A defendant may also be liable if he acts with reckless indifference. The failure to investigate "[i]n the face of numerous warning signs" is sufficient to establish reckless indifference as a matter of law.[63]

Factual allegations in a complaint are sufficient if either individual allegations or the totality of allegations supports the inference of knowing or

---

[58] *Police Ret. Sys. v. Intuitive Surgical, Inc*., 759 F.3d 1051, 1061 (9th Cir. 2014) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)) ("scienter" refers to "a mental state embracing intent to deceive, manipulate, or defraud"); *United States v. Colon-Arreola*, 753 F.3d 841, 845 (9th Cir. 2014) ("The term 'willfully' is synonymous to the term 'intentionally.'").

[59] *United States v. Hancock*, 231 F.3d 557, 562-563 (9th Cir. 2000).

[60] *Id*.

[61] *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68-69 (2007) (recognizing that "recklessness is not self-defining" and adopting common law definition) (internal quotation marks and citations omitted).

[62] *See United States v. Red Eagle*, 60 Fed. Appx. 155, 156 (9th Cir. 2003) (citing *Farmer v. Brennan*, 511 U.S. 825, 836-37 (1994)).

[63] *FTC v. Network Servs. Depot, Inc*., 617 F.3d 1127, 1140-1141 (9th Cir. 2010).

reckless conduct.[64] This independent, two-part analysis "is designed to" prevent examination of "each allegation in isolation without considering them in totality."[65]

The Amended Complaints contain sufficient factual allegations under either applicable standard of knowledge or recklessness. Taken individually or holistically, the allegations demonstrate that the Demirchyans and Gasparyan knew of or were reckless as to the conduct constituting CFPA violations. T3 employees discussed "the notorious scams [they] deal with on a daily basis."[66] Despite this "notorious" illegal activity, T3 turns a blind eye and neither meaningfully vets nor sufficiently monitors its lead generators or its lead purchasers.[67] T3 developed a "Lender Audit Questionnaire" requesting assurance from its lead purchasers that they were in compliance with state laws, knew that many of the lenders to which it sold leads did not comply with those laws, and did not cease doing business with non-responsive purchasers.[68] When T3 received feedback from its purchasers about the consummation of loans, T3 did not use that information to evaluate legal compliance; rather, T3 used that information to facilitate more transactions by selling more loan applications.[69] T3's control of information about its lead generators and purchasers facilitated illegal lending practices.[70] T3 also facilitated

---

[64] *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011) (requiring the conduct of an individual and "holistic" review).

[65] *Okla. Firefighters Pension & Ret. Sys. v. IXIA*, No. CV 13-08440 MMM (SHx), 2015 WL 1775221, at *19 (C.D. Cal. Apr. 14, 2015).

[66] T3 Am Compl., ECF No. 37, ¶ 36; Gasparyan Am. Compl., ECF No. 30, ¶ 38.

[67] T3 Am Compl., ECF No. 37, ¶ 48; Gasparyan Am. Compl., ECF No. 30, ¶ 50.

[68] T3 Am Compl., ECF No. 37, ¶ 37; Gasparyan Am. Compl., ECF No. 30, ¶ 39.

[69] T3 Am Compl., ECF No. 37, ¶ 38; Gasparyan Am. Compl., ECF No. 30, ¶ 40.

[70] T3 Am Compl., ECF No. 37, ¶¶ 40-41; Gasparyan Am. Compl., ECF No. 30, ¶¶ 42-43.

illegal practices by creating and controlling the ping tree, through which it sold loan applications.[71] While consumers are led to believe that they are matched with the best or most appropriate lenders, or with licensed lenders or those who follow state and federal laws, they are really matched with the purchaser willing to pay the most to T3 for the application.[72] T3 knows or has reason to believe that it sells loan applications to lenders offering illegal, usurious loans.[73] Often, T3 sells consumer information to data managers and brokers without regard to how that information will be used.[74] T3 knowingly keeps its involvement secret from consumers.[75]

T3 does not contend, nor could it, that its own conduct within its own network is performed without knowledge or recklessness. Nor can the Demirchyans or Gasparyan claim such ignorance.

Grigor Demirchyan is President, CEO, CFO, and T3's sole Director. He provides accounting services to T3 and claims to have been an owner since the company's founding. In these roles, he "has substantial control over and involvement in the establishment of T3's business policies and practices."[76] Grigor Demirchyan admits, or at least alleges, his own substantial knowledge of and involvement in T3's activities in state court filings relating to Gasparyan and

---

[71] T3 Am Compl., ECF No. 37, ¶ 16; Gasparyan Am. Compl., ECF No. 30, ¶ 18.

[72] T3 Am Compl., ECF No. 37, ¶¶ 16, 21, 23, 25; Gasparyan Am. Compl., ECF No. 30, ¶¶ 18, 23, 25, 27.

[73] T3 Am Compl., ECF No. 37, ¶¶ 27-28; Gasparyan Am. Compl., ECF No. 30, ¶¶ 29-30.

[74] T3 Am Compl., ECF No. 37, ¶ 30; Gasparyan Am. Compl., ECF No. 30, ¶ 32.

[75] T3 Am Compl., ECF No. 37, ¶ 18; Gasparyan Am. Compl., ECF No. 30, ¶ 20.

[76] T3 Am Compl., ECF No. 37, ¶ 6.

Fomichev.[77] The state cases find Fomichev and Gasparyan, on the one hand, opposing T3 and the Demirchyans, on the other, with each claiming ownership of T3 and each arguing, contrary to their assertions here, that he or she has been more fully involved in T3's operations than their counterparts. In that litigation, Grigor Demirchyan admits to carrying out all obligations and duties consistent with his management positions at T3.[78]

Marina Demirchyan is Vice President of T3, and similarly provides accounting services and maintains substantial "control over and involvement in the establishment of T3's business policies and practices."[79] As she testified in the same state litigation (in deposition testimony that has been publicly filed in part), she participated in T3 "meetings every single day… [a]nd every single day we made decisions regarding the business."[80]

Similarly, Gasparyan cannot reasonably claim ignorance of T3's operations. He founded the company and served as its Chief Financial Officer for several years and Chief Marketing Officer from the founding through July 2014.[81] Gasparyan exercised decision-making control over T3's operations, having responsibility to

---

[77] *Gasparyan v. Demirchyan, et al.*, BC554306 (Cal. Super. Ct. Aug. 8, 2014); *Gasparyan v. D and D Marketing, et al.*, BC585895 (Cal. Super. Ct. June 23, 2015). The Court may take judicial notice of state-court filings without converting the instant motion to one for summary judgment. *See, e.g.*, *Callan v. N.Y. Cmty. Bank*, 643 Fed. Appx. 666, 666-67 (9th Cir. 2016). The factual allegations in Grigor Demirchyan's state-court filings and Marina Demirchyan's state-court testimony are their own, and create no disputable facts except, potentially, with their own assertions in defense of this case.

[78] Decl. Supp. Pl.'s Req. Judicial Notice at Ex. 1.

[79] T3 Am Compl., ECF No. 37, ¶ 7.

[80] Decl. Supp. Pl.'s Req. Judicial Notice at Ex. 2.

[81] Gasparyan Am. Compl., ECF No. 30, ¶¶ 5, 7-8.

decide which lead generators and purchasers to accept into T3's network.[82] Gasparyan exercised substantial control over T3's daily operations.[83] Gasparyan alleges in the state court case that he and Fomichev "made all executive decisions" on behalf of T3.[84]

Defendants also argue that the allegations of substantial assistance are insufficient. Courts have articulated what constitutes "substantial assistance" in the securities context, which offers guidance here. A defendant's conduct is "substantial" if the defendant "'in some sort associate[d] himself with the venture, that he participate[d] in it as in something that he wishe[d] to bring about, [and] that he [sought] by his action to make it succeed.'"[85] In other contexts, courts have similarly found that "the threshold for what constitutes substantial assistance is low."[86] The assistance "need not be 'related to the commission or furtherance' of the offending practice in order to constitute substantial assistance."[87] Under instructive FTC rules, even "back-end handling of consumer files . . . could qualify as substantial assistance."[88] Contrary to Defendants' assertions, the Bureau alleges

---

[82] Gasparyan Am. Compl., ECF No. 30, ¶¶ 17, 19.

[83] Gasparyan Am. Compl., ECF No. 30, ¶¶ 56, 68.

[84] Decl. Supp. Pl.'s Req. Judicial Notice at Ex. 3.

[85] *SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012) (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir.1938)).

[86] *See, e.g.*, *FTC v. Lake*, 2016 U.S. Dist. LEXIS 24821, at *11, 2016 WL 1117728 (C.D. Cal. Feb. 24, 2016) (citation and internal quotation marks omitted); *FTC v. Consumer Health Benefits Ass'n*, No. 10-CV-3551 (ILG), 2011 WL 3652248, *5 (E.D.N.Y. Aug. 18, 2011) (quoting Telemarketing Sales Rule, 60 Fed. Reg. 43842–01, 43852 (FTC, Aug. 23, 1995)) ("The 'substantial assistance' doctrine does not impose a demanding standard, as it requires only that the assistance be 'more than mere casual or incidental . . . .'").

[87] *FTC v. Lake*, 2016 U.S. Dist. LEXIS 24821, at *11-12, 2016 WL 1117728 (*citing FTC v. Chapman*, 714 F.3d 1211, 1216 (10th Cir. 2013)).

[88] *Id.* at *12.

specific conduct by the Demirchyans and Gasparyan that easily meets this standard.

In addition to their responsibilities as executives of the company, the Demirchyans and Gasparyan "had substantial control over and involvement in the establishment of T3's business policies and practices;"[89] "had authority and responsibility to decide whether to accept any lead generator or purchaser into or remove them from T3's network;"[90] and "shared responsibility for deciding the position of each purchaser in the ping tree and designing T3's systems to filter and sell applications in the manner most profitable to T3, without regard for the practices of lead generators or purchasers."[91] Taking the alleged facts as true, the Court may draw the reasonable inference that the Demirchyans and Gasparyan participated directly in conducting T3's business with the goal of making it succeed, making the Bureau's claims that they substantially assisted T3's unfair and abusive practices plausible.

Accepting the alleged facts as true and drawing all reasonable inferences in the Bureau's favor, the Amended Complaints states plausible claims against T3, the Demirchyans, and Gasparyan.

## IV. The requested relief is available as a matter of law.

The Bureau's claims are sufficient to justify the requested relief. Where relief is unavailable as a matter of law, that portion of a prayer for relief may be dismissed.[92] Here, Defendants argue that the facts do not support the Bureau's

---

[89] T3 Am Compl., ECF No. 37, ¶¶ 6-7; Gasparyan Am. Compl., ECF No. 30, ¶¶ 8-9.

[90] T3 Am Compl., ECF No. 37, ¶ 15; Gasparyan Am. Compl., ECF No. 30, ¶ 17.

[91] T3 Am Compl., ECF No. 37, ¶ 17; Gasparyan Am. Compl., ECF No. 30, ¶ 19.

[92] *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1170 (C.D. Cal. 2011).

requests for restitution or penalties, which is an improper basis for dismissal where plausible claims have been stated.

Defendants' argument that no harm has been alleged is contrary to the Amended Complaints' allegations. The Bureau alleges specific facts to support the conclusion that T3's conduct is likely to cause substantial injury to consumers, including receiving loans that are void or not legally collectible[93] and that require a distant dispute-resolution process,[94] or that their applications might be sold to purchasers engaged in scams.[95] The Bureau's claims are alleged with sufficient factual content to establish plausible CFPA violations, and the law permits the Court to order both restitution and penalties for those violations.[96]

Dismissal of the Bureau's request for an award of "costs and fees incurred in connection with prosecuting this action" also is not warranted. The CFPA, as the T3 Defendants' acknowledge, permits an award of costs to the Bureau if it is the prevailing party.[97] "Fees" does not exclusively mean attorneys' fees, and certain fees are specifically permitted as costs to be awarded to the prevailing party.[98]

**V. T3's lead generators and lenders are not indispensable parties.**

Gasparyan argues that the lead generators and purchasers in T3's network are necessary parties that must be joined in this action because injunctive relief would impact them and because their absence limits Gasparyan's ability to assert a

---

[93] T3 Am. Compl., ECF No. 37, ¶ 28; Gasparyan Am. Compl., ECF No. 30, ¶ 30.

[94] T3 Am. Compl., ECF No. 37, ¶¶ 32, 34; Gasparyan Am. Compl., ECF No. 30, ¶¶ 34, 36.

[95] T3 Am. Compl., ECF No. 37, ¶ 36; Gasparyan Am. Compl., ECF No. 30, ¶ 38.

[96] 12 U.S.C. §§ 5565(a)(2)(C), (H).

[97] 12 U.S.C. § 5565(b).

[98] L.R. 54-3.9.

defense. These reasons do not meet the standard for required joinder of parties. The Federal Rules of Civil Procedure provide that a party must be joined if "the court cannot accord complete relief among existing parties," or the person "claims an interest" in the action and their absence may "impair or impede the person's ability to protect the interest" or "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest."[99]

Contrary to Gasparyan's assertion, the alleged wrongdoing relates to Gasparyan's own actions in operating T3, a lead aggregator that acts as a service provider to lenders; it is not based on "wrongs [] carried out solely by [non-parties]."[100] Complete relief that addresses Gasparyan's conduct can be obtained through this action without the joinder of T3's lead generators or purchasers. The second reason for joinder requires that an absent person have a legally protected interest in the action. This interest must be more than a financial stake and more than speculation about a future event.[101] While the business choices of lead generators and purchasers on how to conduct their businesses and whether to do future business with Gasparyan may be impacted by any injunctive relief ordered in this action, they do not have an interest that warrants joinder. Finally, their absence does not impair Gasparyan's ability to protect his own interest with regard to the violations alleged or leave Gasparyan at risk of multiple or inconsistent obligations.

---

[99] Fed. R. Civ. P. 19(a)(1).

[100] Gasparyan Mem. Supp. Mot. Dismiss, ECF No. 31, at 21.

[101] *Makah Indian Tribe v. Verity*, 910 F.2d 555, 559 (9th Cir. 1990) (Citing *Northern Alaska Envtl. Ctr. v. Hodel*, 803 F.2d 466, 468 (9th Cir.1986) and *McLaughlin v. Int'l Ass'n of Machinists*, 847 F.2d 620, 621 (9th Cir.1988)).

Gasparyan also argues that T3 is a necessary party to the Bureau's action against Gasparyan. The Bureau does not object to consolidation of the three related actions.

**VI. The Bureau's claims are not time-barred.**

Gasparyan argues that the CFPB "is barred by the statute of limitations from bringing any claims against Gasparyan for any action which took place prior to 2013."[102] Gasparyan's analysis is wrong. The relevant statute of limitations provides that the Bureau may not bring any action under the CFPA "more than 3 years after the date of discovery of the violation to which the action relates."[103] And "[a] claim may be dismissed as untimely pursuant to a 12(b)(6) motion 'only when the running of the statute of limitations is apparent on the face of the complaint.'"[104] Nothing on the face of the Bureau's Amended Complaint suggests that the Bureau discovered Gasparyan's violations before April 2013, i.e., more than three years before the Bureau filed its suit against him. The Court must therefore reject Gasparyan's statute-of-limitations argument.

**VII. The Bureau's structure is not unconstitutional.**

In footnotes, T3, the Demirchyans, and Gasparyan incorporate by reference the argument raised by Fomichev that the Bureau's structure is unconstitutional, making its actions, including this enforcement action, void.[105]

---

[102] Gasparyan Mem. Supp. Mot. Dismiss, ECF No. 31, at 21.

[103] 12 U.S.C. § 5564(g).

[104] *U.S. ex rel. Air Control Techs., Inc. v. Pre Con Indus., Inc.*, 720 F.3d 1174, 1178 (9th Cir. 2013) (quoting *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010)) (alteration omitted).

[105] T3 Mem. Supp. Mot. Dismiss, ECF No. 39, at 3 n.1; Gasparyan Mem. Supp. Mot. Dismiss, ECF No. 31, at 8 n.1 (citing *CFPB v. Fomichev*, CV 16-2724-PSG(Ex), ECF No. 29 (C.D. Cal. Jul. 29, 2016)).

To begin, this argument should be rejected for the simple reason that it was not properly presented. Defendants may not incorporate by reference the arguments made in other briefs, let alone briefs filed by parties in other actions.[106] And to the extent the Court considers those arguments raised in Fomichev's brief in the separate action against him, it should likewise consider the Bureau's arguments opposing Fomichev's constitutional challenge.[107] For the reasons explained in the Bureau's opposition to Fomichev's motion to dismiss, the Bureau's structure is wholly constitutional. Although a panel of the D.C. Circuit last week issued an opinion holding that the Bureau's Director's "for cause" removal protection is unconstitutional, that decision is wrong and, even if it stands, would have no binding effect in this Court.[108] Indeed, in this District, each judge to address the issue has upheld the Bureau's constitutionality.[109] Defendants' argument regarding the Bureau's structure is not a basis for dismissal of this action.

---

[106] *Butler v. L.A. County*, LA CV08-05780-VBF, 2013 WL 8291425, at *2 (C.D. Cal. Oct. 11, 2013) (citing *Swanson v. U.S. Forest Service*, 87 F.3d 339, 345 (9th Cir. 1996); *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002)) ("Under Federal Rule of Civil Procedure 10(c), parties may incorporate by reference only pleadings or exhibits to pleadings, . . . and Fed. R. Civ. P. 7 defines pleading to include only a complaint, and answer, and any court-ordered reply to an answer, not briefs supporting or opposing a motion or any other filing.").

[107] *CFPB v. Dmitry Fomichev*, Pl. Mem. Opp. Mot. Dismiss, ECF No. 32, at 1-12.

[108] *PHH Corp. v. CFPB*, No. 15-1177, ECF No. 1640101 at 10 (D.C. Cir. Oct. 11, 2016).

[109] *CFPB v. CashCall, Inc.*, CV 15-7522-JFW (RAOx), 2016 WL 4820635, at *12 (C.D. Cal. Aug. 31, 2016); *CFPB v. Morgan Drexen, Inc.*, 60 F. Supp. 3d 1082, 1086-92 (C.D. Cal. 2014). *See also CFPB v. ITT Educ. Servs., Inc.*, — F. Supp. 3d —, 2015 WL 1013508, at *7-14 (S.D. Ind. Mar. 6, 2015).

## CONCLUSION

For the foregoing reasons, the Bureau respectfully requests that the Court deny the motions to dismiss filed by T3 and the Demirchyans and Gasparyan.

Dated: October 17, 2016

Respectfully submitted,

/s/ Barry E. Reiferson
Barry E. Reiferson
Attorney-Advisor, Office of Enforcement
Consumer Financial Protection Bureau,
*Plaintiff*