ASHLEY VINSON CRAWFORD (SBN 257246)
avcrawford@akingump.com
DANIELLE C. GINTY (SBN 261809)
dginty@akingump.com
**AKIN GUMP STRAUSS HAUER & FELD LLP**
580 California Street, Suite 1500
San Francisco, CA 94014
Telephone: 415.765.9500
Facsimile: 415.765.9501

PATRICK M. KELLY (SBN 45426)
patrick.kelly@wilsonelser.com
HERBERT P. KUNOWSKI (SBN 150141)
herbert.kunowski@wilsonelser.com
**WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP**
555 South Flower Street, Suite 2900
Los Angeles, CA 90071
Telephone: 213.443.5100
Facsimile: 213.443.5101

Attorneys for Defendants D and D Marketing, Inc., d/b/a T3Leads, Grigor Demirchyan, and Marina Demirchyan

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| Consumer Financial Protection Bureau,<br><br>Plaintiffs,<br><br>v.<br><br>D and D Marketing, Inc., d/b/a T3Leads, Grigor Demirchyan, and Marina Demirchyan,<br><br>Defendants. | Case No. 2:15-cv-09692<br><br>DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS<br><br>Date: November 7, 2016<br>Time: 1:30 p.m.<br>Judge: Hon. Philip S. Gutierrez<br>Ctrm: 880 - Roybal |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........ 1

I. THE BUREAU HAS NO AUTHORITY TO BRING THIS ACTION........ 1

A. T3 Is Not A Service Provider Under The CFPA. ........ 1

B. Even If T3 Were A Service Provider, This Action Exceeds The Bureau's Enforcement Authority. ........ 2

II. CONSTRUING T3'S CONDUCT AS "UNFAIR" OR "ABUSIVE" WOULD VIOLATE DEFENDANTS' DUE PROCESS RIGHT TO FAIR NOTICE. ........ 3

III. THE COMPLAINT FAILS TO ADEQUATELY PLEAD THAT T3 ENGAGED IN ANY UNFAIR ACTS OR PRACTICES. ........ 7

IV. THE COMPLAINT FAILS TO ADEQUATELY PLEAD THAT T3 ENGAGED IN ANY ABUSIVE ACTS OR PRACTICES. ........ 9

V. THE COMPLAINT DOES NOT STATE VIABLE § 5536(A)(3) CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS. ........ 10

A. The Complaint Does Not Plausibly Allege That The Demirchyans Acted Knowingly Or Recklessly. ........ 10

B. The Complaint Does Not Plausibly Allege That The Demirchyans Substantially Assisted T3 In Violating Any Law. ........ 11

VI. THE BUREAU CANNOT RECOVER THE RELIEF IT SEEKS. ........ 12

VII. CONCLUSION........ 12

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..... 7, 8

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ..... 1

*Bresgal v. Brock*,
843 F.2d 1163 (9th Cir. 1987) ..... 4

*C.F.P.B. v. CashCall, Inc.*,
No. 15-7522-JFW, 2016 WL 4820635 (C.D. Cal. Aug. 31, 2016) ..... 5, 8, 9

*Camp v. Dema*,
948 F.2d 455 (8th Cir. 1991) ..... 10, 12

*CFPB v. ITT Educ. Servs., Inc.*
No. 1:14-CV-00292-SEB, 2015 WL 1013508 (S.D. Ind. Mar. 6, 2015) ..... 3, 4

*Chicago Male Med. Clinic, LLC v. Ultimate Mgmt., Inc.*,
No. EDCV 13-00199 SJO, 2014 WL 7180549
(C.D. Cal. Dec. 16, 2014) ..... 10

*Compare Safeco Ins. Co. of Am. v. Burr*,
551 U.S. 47 (2007) ..... 11

*Davis v. HSBC Bank Nev., N.A.*,
691 F.3d 1152 (9th Cir. 2012) ..... 9

*Durham v. Kelly*,
810 F.2d 1500 (9th Cir. 1987) ..... 12

*F.C.C. v. Fox Television Stations, Inc.*,
___ U.S. ___, 132 S. Ct. 2307 (2012) ..... 3, 4

*F.T.C. v. IFC Credit Corp.*,
543 F. Supp. 2d 925 (N.D. Ill. 2008) ..... 6, 9

*F.T.C. v. Neovi, Inc.*,
604 F.3d 1150 (9th Cir. 2010) ..... 7

*F.T.C. v. Wyndham Worldwide Corp.*,
799 F.3d 236 (3d Cir. 2015) ..... 3

*Hollinger v. Titan Capital Corp.*,
914 F.2d 1564 (9th Cir. 1990) ..... 11

*In re Countrywide Fin. Corp. Mortgage Mktg. & Sales Practices Litig.*,
601 F. Supp. 2d 1201 (S.D. Cal. 2009) ..... 5, 7, 9

*Landgraf v. USI Film Products*,
511 U.S. 244 (1994) ... 7

*Lee v. City of Los Angeles*,
250 F.3d 668 (9th Cir. 2001) ... 4

*Lundquist v. Cont'l Cas. Co.*,
394 F. Supp. 2d 1230 (C.D. Cal. 2005) ... 4

*Modglin v. DJO Global Inc.*,
114 F. Supp. 3d 993 (C.D. Cal. 2015) ... 10

*PHH Corp. v. CFPB*,
No. 15-1177, 2016 WL 5898801 (D.C. Cir. Oct. 11, 2016) ... 7

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) ... 10

*Pretap v. Wells Fargo Bank, N.A.*,
63 F. Supp. 3d 1101 (N.D. Cal. 2014) ... 11

*Price v. Stevedoring Servs. of Am., Inc.*,
697 F.3d 820 (9th Cir. 2012) ... 4

*Pulaski & Middleman, LLC v. Google, Inc.*,
802 F.3d 979 (9th Cir. 2015) ... 12

*Rolf v. Blyth, Eastman Dillon & Co., Inc.*,
570 F.2d 38 (2d Cir. 1978) ... 11

*S.E.C. v. Apuzzo*,
689 F.3d 204 (2d Cir. 2012) ... 12

*S.E.C. v. Chenery Corp.*,
332 U.S. 194 (1947) ... 4

*Sabri v. United States*,
541 U.S. 600 (2004) ... 3

*Sheets v. DHI Mortgage Co.*,
No. CV F 09-1030 LJO DLB, 2009 WL 2171085
(E.D. Cal. July 20, 2009) ... 5

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
497 F.3d 144 (2d Cir. 2007) ... 9

*S.E.C. v. Fehn*,
97 F.3d 1276 (9th Cir. 1996) ... 10

*United States v. Colon-Arreola*,
753 F.3d 841 (9th Cir. 2014) ... 10

*United States v. Hancock*,
231 F.3d 557 (9th Cir. 2000) ... 10

*Woodward v. Metro Bank of Dallas*,
522 F.2d 84 (5th Cir. 1975) ... 11

## STATUTES


12 C.F.R. § 225.28(b) ........ 1
12 C.F.R. § 225.86(d)(1) ........ 2
12 U.S.C. § 5481(26)(B)(i) ........ 2
12 U.S.C. § 5514 ........ 2
12 U.S.C. § 5531(c)(1) ........ 5, 7
12 U.S.C. § 5531(d)(2)(A) ........ 6
12 U.S.C. § 5536(A)(3) ........ 10
12 U.S.C. § 5564 ........ 2
12 U.S.C. § 5564(a) ........ 2
15 U.S.C. § 78t(a) ........ 10

## INTRODUCTION

The Consumer Financial Protection Act ("CFPA") provides no authority for the Bureau's unprecedented theory of liability, which would patently violate Defendants' Due Process right to fair notice, and the Bureau cannot cite authority to support it. Recognizing that the expense of discovery and litigation can literally destroy defendants, the Supreme Court has long cautioned that "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (citation omitted). After two opportunities to plead a viable claim against Defendants, the Bureau has failed to do so. The Amended Complaint ("Complaint") should now be dismissed with prejudice.

## I. THE BUREAU HAS NO AUTHORITY TO BRING THIS ACTION.

### A. T3 Is Not A Service Provider Under The CFPA.

Neither the Complaint, the law, nor common sense supports the Bureau's expansive reading of the term "service provider" under the CFPA. The Bureau contends that T3 is a service provider because it purportedly "processes transactions" for lenders (Opp. at 2-3), but it does not plead that T3 processes transactions. Nor could it. Instead, the Complaint alleges that T3 buys and sells loan applications as "leads." AC, ¶¶ 5, 8-11. However, the Bureau cannot cite any authority indicating that buying and selling loan applications qualifies as "process[ing] transactions" under the CFPA, and neither the statute's plain language nor legislative intent supports the Bureau's broad reading. The Bureau does not dispute that the CFPA's definition of "service provider" was "designed to create authority that is generally comparable to the authority that federal banking regulators have under the Bank Service Company Act." S. REP. 111-176, 160-61. Under that Act, banking regulators have authority to regulate *financial service transactions*, e.g., activities related to "financing transactions," "transaction[s] in foreign exchange," securities transactions, and other investing and trading activities—not *any* transactions. 12 C.F.R. § 225.28(b). These regulations also confirm that the

"finder" services T3 provides are not within the purview of banking regulators (or the Bureau). *Id*. § 225.86(d)(1).

Moreover, T3's services fall squarely within the CFPA's express exclusion for those "support service[s] of a type provided to businesses generally or a similar ministerial service." 12 U.S.C. § 5481(26)(B)(i). The Bureau does not plead any facts supporting its conclusion that T3's services are "uniquely tailored to the needs of small-dollar lenders." Opp. at 4. Nor could it.[1] Even the Federal Trade Commission, which does have jurisdiction over the lead generation industry, acknowledges that lead generators provide valuable services for consumers across a *variety of industries*.[2] The Bureau likewise fails to allege facts supporting its conclusion that "T3 exercises judgment and discretion in filtering applications through [its] 'ping tree.'" *Id.* at 3. Instead, the Bureau concedes that T3 sells leads by sorting them through its *automated "ping tree" system, which matches the leads to parameters set by independent lenders and other lead purchasers*. AC, ¶¶ 16, 18, 26. The Bureau does not and cannot allege that T3 plays any role in deciding whether loans are ever issued.[3]

**B. Even If T3 Were A Service Provider, This Action Exceeds The Bureau's Enforcement Authority.**

The Bureau concedes that it does not have the authority to *supervise* T3 under § 5514, but nevertheless contends that it still has *enforcement* authority over it. Opp. at 4. The plain language of the statute says otherwise. The Bureau's enforcement authority under § 5564(a) is *expressly limited* by § 5514. 12 U.S.C. § 5564(a) ("If any person violates a Federal consumer financial law, the Bureau may, *subject to section[] 5514* . . . commence a civil action against such person . . . .") (emphasis added). Properly read

---

[1] Notably, the Bureau does not allege that T3 *only* sells leads to lenders, data managers, data brokers, and remarketing companies, but rather correctly acknowledges that "[t]he purchasers in T3's network include" these third parties. AC ¶ 11.

[2] *See* Jessica L. Rich, Director, FTC Bureau of Consumer Protection, Introductory Remarks to Follow the Lead: An FTC Workshop on Lead Generation, *available at* https://www.ftc.gov/public-statements/2015/10/introductory-remarks-follow-lead-ftc-workshop-lead-generation.

[3] The Bureau also concedes that Defendants were not provided the loan terms that lenders ultimately offered to consumers. AC, ¶ 25.

together, these sections plainly prohibit the Bureau's enforcement action against T3.

## II. CONSTRUING T3'S CONDUCT AS "UNFAIR" OR "ABUSIVE" WOULD VIOLATE DEFENDANTS' DUE PROCESS RIGHT TO FAIR NOTICE.

Due process demands notice and predictability in the rule of law, so that regulated parties know what is required of them. *See F.C.C. v. Fox Television Stations, Inc.*, ___ U.S. ___, 132 S. Ct. 2307, 2317 (2012). Contrary to the Bureau's contention, the fact that the CFPA's (and other similar statutes') prohibitions on unfair and abusive acts and practices have withstood *facial* due process challenges does not resolve the constitutional problem presented here. Opp. at 7-8. A facial attack requires a defendant to establish "that no application of the statute could be constitutional." *Sabri v. United States*, 541 U.S. 600, 609 (2004). "[T]he relevant question" in this *as applied* due process challenge is whether Defendants "had fair notice that [T3's] conduct could fall within the meaning of the statute." *F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 255 (3d Cir. 2015).

Cases finding that prohibitions on unfair or abusive acts and practices provide fair notice cite *specific allegations* showing the defendants were on notice (by law, agency guidance, or other warning flags) such that their conduct could be deemed unfair or abusive. For example, in *Wyndham*, the FTC alleged Wyndham engaged in unfair practices by failing to employ sufficient data security measures in its property management system, even after it was hacked three times. *Id.* at 240-242. The court rejected Wyndham's claim that it lacked fair notice of what "cybersecurity practices [we]re necessary to avoid liability" because the FTC had previously issued a guidebook outlining a checklist of permissible practices and counseling against the specific practices alleged there, filed multiple complaints, and entered consent decrees in administrative cases raising unfairness claims based on inadequate cybersecurity practices with "close corollaries" to those allegedly employed by Wyndham. *Id*. at 255-58. The court in *CFPB v. ITT Educ. Servs., Inc.* likewise cited multiple prior cases condemning the types of practices ITT was alleged to have committed. No. 1:14-CV-

00292-SEB, 2015 WL 1013508, at *27-29 (S.D. Ind. Mar. 6, 2015).

Here, the Bureau does not identify any law, agency guidance, or other warning signs that could reasonably have put T3 on notice that its conduct could be deemed unfair or abusive. The Court cannot simply accept the Bureau's word for it. And the Supreme Court has made clear that economic regulations can violate due process constraints, despite the lesser scrutiny afforded to them. *See*, *e.g.*, *Fox*, 132 S. Ct. at 2320. Not surprisingly, the law does not afford any special deference to an agency's novel statutory interpretation announced for the first time in an enforcement action. *Bresgal v. Brock*, 843 F.2d 1163, 1168 (9th Cir. 1987). As the Ninth Circuit has cautioned:

> [D]eferring to agencies' litigating positions interpreting statutes they are charged with administering would create a danger that agencies would avoid promulgating regulations altogether, given the comparative ease of announcing a new statutory interpretation in a brief rather than through formal rulemaking. This result would severely undermine the notice and predictability to regulated parties that formal rulemaking is meant to promote.

*Price v. Stevedoring Servs. of Am., Inc.*, 697 F.3d 820, 830 (9th Cir. 2012).[4]

<u>T3 did not have fair notice that it was required to undertake an affirmative duty to vet and monitor third parties</u>. The CFPA does not impose such duty, notwithstanding the Bureau's argument. Opp. at 6. No case, statute, regulation, rule, or other agency guidance does, either. The Bureau's Bulletin and Examination Procedures cited in Defendants' Motion plainly state that *covered persons are required to supervise and monitor their service providers*, not the other way around. Defs' RJN, Doc. 39-1-3, Exhs. A, B.[5] T3 cannot be penalized for not taking actions that it did not and could not know were required.

---

[4] Nor is the Bureau's discretion to proceed by adjudication rather than rulemaking without limits. *See S.E.C. v. Chenery Corp.*, 332 U.S. 194, 202–03 (1947). The formal rulemaking process provides the checks and balances necessary to prevent just this kind of government overreach.

[5] These documents are properly subject to judicial notice on a motion to dismiss. *See Lee v. City of Los Angeles*, 250 F.3d 668, 689–90 (9th Cir. 2001); *Lundquist v. Cont'l Cas. Co.*, 394 F. Supp. 2d 1230, 1243 (C.D. Cal. 2005).

T3 did not have fair notice that its conduct could be considered unfair.[6] T3 could not possibly have concluded that its conduct was "likely to cause substantial injury to consumers." T3 is entitled to rely on existing law when conducting its business. None of the lead generators' statements identified in the Complaint is unlawful under existing law. *See In re Countrywide Fin. Corp. Mortgage Mktg. & Sales Practices Litig.*, 601 F. Supp. 2d 1201, 1217-18 (S.D. Cal. 2009). The law is likewise clear that even lenders are not required to ensure that consumers receive the "best" loan terms. *Id*.; *Sheets v. DHI Mortgage Co.*, No. CV F 09-1030 LJO DLB, 2009 WL 2171085, at *4 (E.D. Cal. July 20, 2009). The CFPA cannot reasonably be read to impose greater liability on T3 than the companies it is purportedly required to monitor.

T3 also cannot be required to divine new developments in the law. The law governing tribal and offshore lenders' loan practices is unsettled. Notably, *C.F.P.B. v. CashCall, Inc.*, No. 15-7522-JFW, 2016 WL 4820635 (C.D. Cal. Aug. 31, 2016), does not hold that all tribal and offshore lending is unlawful. The court in *CashCall* undertook a comprehensive analysis of the organization and structure of defendants' lending operations to conclude on the particular facts in that case that (i) CashCall—rather than the entity formed by an individual member of and licensed to do business by the tribe—functioned as the true lender; (ii) the contractual choice of tribal law was not enforceable; (iii) loans with interest rates exceeding statute usury limits were void or uncollectible under various states' usury laws; and (iv) thus, the defendants engaged in deceptive practices under the CFPA by servicing and collecting on those loans. *Id*. at *5-10. Even if the *CashCall* decision could be applied more broadly than its facts, it would be unreasonable to conclude that T3 should be responsible for undertaking the kind of analysis the *CashCall* court conducted before it provides a lender services. It is neither logical nor constitutionally permissible to penalize T3 for failing to police the

[6] The Bureau's authority to declare an act or practice "unfair" is expressly limited to those situations where "the Bureau has a reasonable basis to conclude that -- (A) the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and (B) such substantial injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c)(1).

lead generators and lenders with which it did business to ensure that those independent companies engaged in practices that existing law does not clearly require.

T3 also cannot reasonably be expected to believe its conduct could prevent consumers from making free and informed borrowing decisions. The Bureau acknowledges that consumers are afforded the opportunity to review the material terms of their loan agreements with lenders before consummating the loans. AC, ¶ 63. Consumers, like any contracting party, have the duty to understand the obligations they are assuming. *F.T.C. v. IFC Credit Corp.*, 543 F. Supp. 2d 925, 946 (N.D. Ill. 2008). The Bureau does not and cannot contend that consumers were bound to accept the loan terms offered to them by lenders, or were prevented from comparison shopping or researching the licensing status of, or any disciplinary actions against, the lenders.

For this same reason, T3 did not have fair notice that its conduct could be deemed abusive.[7] The Bureau does not even attempt to explain how T3's commercially reasonable (and an undeniably common) practice of selling leads at prices the market is willing to pay could take unreasonable advantage of consumers. And consumers cannot complain of any lack of understanding, when the law requires them to understand the terms of their agreements. *Id.*; AC, ¶ 63.

The CFPA's general prohibitions on unfair and abusive practices cannot be extended to penalize T3 for purportedly failing to undertake an affirmative and ongoing duty *that existing law does not impose*, so as to prevent conduct *that no other court has found to be unlawful*, even when consumers undeniably have *the means, ability, and legal duty to read and understand the material terms of their agreements* and thus avoid the very harm the Bureau contends they could suffer. Even if the Bureau's unprecedented interpretation could be permissibly applied prospectively—it cannot—the Bureau's novel interpretation here cannot constitutionally be applied *retroactively* to penalize T3 for conduct it could not have anticipated was unlawful before this lawsuit.

[7] The Bureau asserts that T3 "takes advantage of consumers' lack of understanding of the material risks, costs, or conditions of the products for which they apply" in violation of § 5531(d)(2)(A) of the CFPA. AC, ¶ 67.

*PHH Corp. v. CFPB*, No. 15-1177, 2016 WL 5898801, at *36 (D.C. Cir. Oct. 11, 2016). This principle against retroactivity "is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." *Landgraf v. USI Film Products*, 511 U.S. 244, 265 (1994).

## III. THE COMPLAINT FAILS TO ADEQUATELY PLEAD THAT T3 ENGAGED IN ANY UNFAIR ACTS OR PRACTICES.

The Bureau has not alleged sufficient facts to raise a plausible inference that T3's conduct "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and . . . is not outweighed by countervailing benefits to consumers" and thus is unfair under the CFPA.[8] 12 U.S.C. § 5531(c)(1).

The Bureau's unsupported allegations that T3 "knew or should have known" its lead purchasers were engaged in unlawful conduct simply are not enough to infer a causal link between T3's conduct and any potential injury to consumers.[9] Opp. at 10-11. As the case the Bureau invokes makes clear, consumers can be "injured . . . through the actions of those whose practices facilitate, or contribute to, ill intentioned schemes ***if the injury was a predictable consequence of those actions***." *F.T.C. v. Neovi, Inc.*, 604 F.3d 1150, 1156 (9th Cir. 2010) (emphasis added).

In contrast to this case, the facts in *Neovi* undeniably showed that consumer injury was a predictable consequence of the defendants' business. The defendants in *Neovi* managed a website "that created and delivered unverified checks at the direction of registered users. During its six-year run, fraudsters and con artists extensively abused the website[,]" requiring the defendants to freeze over 13,750 user accounts for fraud. *Id*. at 1153-54. "Those accounts spawned nearly 155,000 checks . . . and were the

[8] The Bureau does not even attempt to plead facts supporting the third element of its unfairness claim. AC, ¶ 52; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action . . . do not suffice.").

[9] The Bureau still has not identified any legally-cognizable injury that consumers are likely to suffer. Consumers cannot be injured by representations they cannot rely upon, or by loans that did not provide the lowest or best interest rate. *In re Countrywide*, 601 F. Supp. 2d at 1217-18.

source of checks totaling more than $402,750,000—an amount more than half of the total drawn during that time." *Id*. at 1154. The defendants received thousands of complaints, and "its president testified that [defendants] expected the site would be used for fraudulent purposes from the beginning." *Id*. at 1157. These facts "easily" allowed the court to find the defendants' conduct satisfied the unfairness test. *Id*.

Here, **the Bureau does not allege a single fact that did or should have put T3 on notice of any unlawful conduct of the lead generators or lead purchasers.** It is not enough to just say that T3 "should have known." *Ashcroft*, 556 U.S. at 679 ("[M]ere conclusions[] are not entitled to the assumption of truth"). The law does not obligate T3 to affirmatively seek out and police the misconduct of the independent third parties with which it does business. Section II, *supra*; Defs' Mot. at 10-11.

The Bureau also does not plead facts suggesting that any lead generator or lead purchaser with which T3 did business engages in unlawful conduct. The Bureau does not allege that *any of the data brokers or data managers to whom T3 sells leads (or any downstream buyers of its leads)* engaged in the fraudulent activity that the Bureau claims is prevalent in the short-term lending industry. Opp. at 10-11; AC, ¶ 36. And the Bureau apparently concedes that lead generators with which T3 did business did not engage in misconduct, a crucial fact the Bureau dismisses as "irrelevant." Opp. at 11.

The crux of the Bureau's novel theory here is that the tribal and offshore lenders to whom T3 sells leads operate unlawfully, and T3 should not do business with them. However, the Bureau does not and cannot plead facts showing that the lenders to whom T3 sells leads operate unlawfully, much less that T3 should have predicted that they would operate unlawfully. This begs the obvious question—why is the Bureau pursuing T3 and not the actual lenders? Perhaps because no court we are aware of has held that any tribal or offshore-based lender is *automatically* subject to or violates state usury laws. The recent decision in *CashCall* says no such thing. And the Bureau's conclusory assertions here fall far short of the facts *CashCall* confirms would be necessary to raise a plausible inference that the lenders to whom T3 sells leads are operating unlawfully.

*CashCall*, 2016 WL 4820635, at *5-9. It cannot reasonably be inferred that T3 knew, should have known, or could have predicted that any consumers would suffer any substantial injury as a result of any lender's conduct.

Even if the facts alleged were sufficient to support such an inference, well-established law and the facts pled by the Bureau confirm that consumers could reasonably avoid any injury. The law does not permit consumers to rely on puffery, and places the responsibility on consumers to understand the terms of contracts they make. *In re Countrywide*, 601 F. Supp. 2d at 1217-18; *IFC Credit*, 543 F. Supp. 2d at 946. And the Complaint concedes that consumers have the means and ability to review and understand the material terms of their loan agreements. AC, ¶ 63; *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012) (disclaimers rendered injury reasonably avoidable). The Bureau has not and cannot plead a viable unfairness claim here.

## IV. THE COMPLAINT FAILS TO ADEQUATELY PLEAD THAT T3 ENGAGED IN ANY ABUSIVE ACTS OR PRACTICES.

The Bureau asserts that T3 takes unreasonable advantage of consumers' lack of understanding by allowing lead generators to publish advertisements that misstate the loan terms lenders actually offer. Opp. at 12-13. Accepting the Bureau's theory would require this Court to ignore decades of settled law governing consumer advertising and contracts. "When an advertiser claims his store [] has the 'lowest' prices or his product is the 'best,' no one expects that consume[r]s will take his claims at face-value . . . ." *In re Countrywide*, 601 F. Supp. 2d at 1217 (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 160 (2d Cir. 2007)). The Bureau concedes that the lenders' websites provide lengthy disclosures revealing the material terms of the offered loans, negating any of the purportedly misleading statements made by the lead generators. AC, ¶ 63. Consumers, like any contracting party, have the duty to understand the obligations they are assuming. *IFC Credit*, 543 F. Supp. 2d at 946-947. The Bureau does not and cannot plead that T3 engaged in any abusive practices.

## V. THE COMPLAINT DOES NOT STATE VIABLE § 5536(a)(3) CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS.

### A. The Complaint Does Not Plausibly Allege That The Demirchyans Acted Knowingly Or Recklessly.

Individual liability under § 5536(a)(3) plainly encompasses a scienter requirement, and the Bureau does not cite *any* authority to the contrary. Courts considering analogous claims under the Securities and Exchange Act of 1934 ("Exchange Act") require proof of scienter.[10] *E.g., S.E.C. v. Fehn*, 97 F.3d 1276, 1295 (9th Cir. 1996). To establish scienter, the Bureau must allege facts to plausibly suggest that the Demirchyans knew of T3's alleged violations of the CFPA or recklessly disregarded them. 12 U.S.C. § 5536(a)(3); *Fehn*, 97 F.3d at 1288. It does not.

Knowledge under § 5536(a)(3) requires "'actual knowledge' of the primary wrong and of the aider and abettor's 'role in furthering that violation.'"[11] *Fehn*, 97 F.3d at 1295 (citation omitted); *Camp v. Dema*, 948 F.2d 455, 459 (8th Cir. 1991) ("The word 'abet' includes knowledge of the wrongful purpose of the perpetrator and counsel and encouragement in the crime.") (citation omitted). With mere conclusory statements, the Complaint asserts the Demirchyans "knowingly . . . provided substantial assistance to T3," but does not allege *any fact* indicating the Demirchyans *knew* T3 was engaged in any wrongful act. AC, ¶¶ 55, 57, 69, 71. This is patently insufficient. *U.S., ex rel. Modglin v. DJO Global Inc.*, 114 F. Supp. 3d 993, 1012 (C.D. Cal. 2015) ("[K]nowledge

---

[10] Notably, the Bureau acknowledges that the securities laws – like the Exchange Act – "offer[] guidance" on the meaning of "substantial assistance" under § 5536(a)(3), Opp. at 18, but conveniently ignores the guidance the Exchange Act jurisprudence provides on § 5536(a)(3)'s scienter requirements.

[11] None of the cases the Bureau cites support its claim that individual defendants need only have "knowledge of the facts, acts or transactions constituting the alleged violation." Opp. at 13-14 (citing *Chicago Male Med. Clinic, LLC v. Ultimate Mgmt., Inc.*, No. EDCV 13-00199 SJO, 2014 WL 7180549, at *9 (C.D. Cal. Dec. 16, 2014) (quoting an Illinois statute governing franchise relationships); *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014) (discussing scienter standard under 15 U.S.C. § 78t(a), i.e., joint and several liability for control persons); *United States v. Colon-Arreola*, 753 F.3d 841, 844 (9th Cir. 2014) (holding conviction for battery of a peace officer under California Penal Code requires willful application of force); *United States v. Hancock*, 231 F.3d 557, 562 (9th Cir. 2000) (addressing federal statute rendering it unlawful for a person convicted of misdemeanor domestic violence to possess a firearm)).

must [] be pleaded sufficiently").

The Bureau likewise fails to sufficiently plead that the Demirchyans acted recklessly. "Reckless conduct is, at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"[12] *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 47 (2d Cir. 1978) (citation omitted); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990). The Bureau does not allege any facts suggesting that T3 violated the CFPA or engaged in any conduct that would have put the Demirchyans on notice of any potential violations, let alone that T3's allegedly unfair and abusive conduct was *so obvious* that the Demirchyans *must have been aware of it*. Instead, the Bureau relies on the Demirchyans' positions in the company and the commonplace decisions they allegedly made in the ordinary course of business.[13] Opp. at 16-17. Such allegations are insufficient as a matter of law to establish aider and abettor liability under the CFPA. *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 95-97 (5th Cir. 1975).

**B. The Complaint Does Not Plausibly Allege That The Demirchyans Substantially Assisted T3 In Violating Any Law.**

The Bureau insufficiently pleads that because the Demirchyans "participated directly in conducting T3's business with the goal of making it succeed," they must have substantially assisted in T3's alleged violations. Opp. at 19. To plead "substantial assistance," the Bureau must allege facts indicating that the Demirchyans "associate[d

[12] The standard articulated by the Bureau is essentially the same as the controlling standard under the Exchange Act. *Compare Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68 (2007) (defendant acted recklessly under the Fair Credit Reporting Act if there was "an unjustifiably high risk of harm that is either known or so obvious that it should be known.") *with Rolf*, 570 F.2d at 47.

[13] The Court cannot consider the state court filings upon which the Bureau relies because the documents are not the proper subject of judicial notice, as the Bureau improperly seeks to rely on the truth of the matters asserted in the documents. *See Pretap v. Wells Fargo Bank, N.A.*, 63 F. Supp. 3d 1101, 1104 n.1 (N.D. Cal. 2014). In any event, the cited statements merely suggest the individual defendants were involved in T3's routine, and entirely legal, business decisions.

themselves] with the venture, . . . participate[d] in it as in something that [they] wished to bring about, [and sought by their] action to make it succeed."[14] Opp. at 18 (quoting *S.E.C. v. Apuzzo*, 689 F.3d 204, 212 (2d Cir. 2012)). The defendant "must have some degree of knowledge that his actions are aiding the primary violator." *Camp*, 948 F.2d at 460. Here, the Bureau pleads no facts establishing how the Demirchyans assisted T3 with or contributed to T3's allegedly wrongful conduct. Nor does the Bureau allege that either of the Demirchyans was in any way involved in or even aware of any violation. Neither their positions in the company nor their alleged control over T3's business is sufficient to show that the Demirchyans substantially assisted T3 in any violation. *See Durham v. Kelly*, 810 F.2d 1500, 1505 (9th Cir. 1987).

## VI. THE BUREAU CANNOT RECOVER THE RELIEF IT SEEKS.

The Bureau cannot recover restitution because it alleges only the possibility of *future* injury, not actual injury to any consumer. *See Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015). The Bureau likewise cannot recover penalties, as the Bureau's novel interpretation of the CFPA cannot constitutionally be applied retroactively to penalize T3 for conduct it could not have anticipated was unlawful before this lawsuit was filed. *PHH*, 2016 WL 5898801, at *36. Finally, the Bureau apparently now concedes it is not entitled to attorneys' fees. (Opp. at 20).

## VII. CONCLUSION

The Complaint should be dismissed with prejudice.

Dated: October 24, 2016

AKIN GUMP STRAUSS HAUER & FELD LLP

By *__/s/ Ashley Vinson Crawford__*
Ashley Vinson Crawford

Attorneys for Defendants

[14] The formulations of "substantial assistance" referenced in the Bureau's other cases are contrary to *Apuzzo*, which the Bureau acknowledges applies here. Opp. at 18.