ASHLEY VINSON CRAWFORD (SBN 257246)
avcrawford@akingump.com
DANIELLE C. GINTY (SBN 261809)
dginty@akingump.com
**AKIN GUMP STRAUSS HAUER & FELD LLP**
580 California Street, Suite 1500
San Francisco, CA 94014
Telephone: 415.765.9500
Facsimile: 415.765.9501

PATRICK M. KELLY (SBN 45426)
patrick.kelly@wilsonelser.com
HERBERT P. KUNOWSKI (SBN 150141)
herbert.kunowski@wilsonelser.com
**WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP**
555 South Flower Street, Suite 2900
Los Angeles, CA 90071
Telephone: 213.443.5100
Facsimile: 213.443.5101

Attorneys for Defendants D and D Marketing, Inc., d/b/a T3Leads, Grigor Demirchyan, and Marina Demirchyan

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| Consumer Financial Protection Bureau,<br><br>Plaintiffs,<br><br>v.<br><br>D and D Marketing, Inc., d/b/a T3Leads, Grigor Demirchyan, and Marina Demirchyan,<br><br>Defendants. | Case No. 2:15-cv-09692<br><br>DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS<br><br>Date: November 7, 2016<br>Time: 1:30 p.m.<br>Judge: Hon. Philip S. Gutierrez<br>Ctrm: 880 - Roybal |

Defendants D & D Marketing, Inc. d/b/a T3Leads, Grigor Demirchyan, and Marina Demirchyan, by and through their counsel of record, hereby file this Notice of Supplemental Authority in support of their Motion to Dismiss to bring to the Court's attention the Consumer Financial Protection Bureau's (the "Bureau") recently-issued Compliance Bulletin and Policy Guidance; 2016–02, Service Providers, which clarifies the Bureau's previous guidance on service providers, formerly titled CFPB Bulletin 2012–03, Service Providers.[1] A true and correct copy of Compliance Bulletin and Policy Guidance; 2016–02, Service Providers, which was published in the Federal Register on October 26, 2016 is attached hereto as Exhibit A.

The Bureau's new guidance confirms two critical points raised in Defendants' Motion to Dismiss. First, while Bulletin 2016-02 (like its predecessor Bulletin 2012-03) makes clear that the Bureau expects banks and nonbank *covered persons* to take affirmative steps to conduct "thorough due diligence" and "on-going monitoring" of the service providers with which they do business, the Bulletin does *not* impose any comparable, reciprocal obligations on service providers to monitor the covered persons with which they do business. Exh. A, §1.C. The Bureau cannot identify any case law, statute, regulation, rule, or other agency guidance that requires any service provider to undertake affirmative, ongoing duties to vet and monitor the conduct of third parties with which they do business, and the foregoing contradicts the Bureau's position before this Court.

Second, the Bulletin confirms that the Consumer Financial Protection Act (the "CFPA") "grants the [Bureau] supervisory and enforcement authority over *supervised* service providers," not all service providers. Exh. A, §1.B. (emphasis added). The Bulletin directly contradicts the Bureau's contention that its enforcement authority is not concurrent with its supervisory authority. [Doc. 48 at 4.] As Defendants detailed in

[1] Defendants referenced and sought judicial notice of the former guidance, CFPB Bulletin 2012–03, Service Providers, in their Motion to Dismiss. [Doc. Nos. 39, 39-1, 39-2.]

their Motion to Dismiss and Reply papers, T3 is not a service provider, but even if it were, because T3 is not a supervised service provider, as defined by § 5514, the Bureau does not have authority to bring an enforcement action against it. [Doc. 39 at 5-8; Doc. 53 at 1-3.]

Dated: November 3, 2016

AKIN GUMP STRAUSS HAUER & FELD LLP

By *\/s/ Ashley Vinson Crawford*
Ashley Vinson Crawford

Attorneys for Defendants

# Exhibit A

Case 2:15-cv-09692-PSG-E Document 55 Filed 11/03/16 Page 5 of 7 Page ID #:336



ADDITIONAL AND AMENDED PET FIELDS

[Same as in 60 day notice]

| Affected entities | SDRs, SEFs, DCMs, DCOs, SD/MSPs, non-SD/MSP reporting entities | | |
|---|---|---|---|
| Burden type | Burden per respondent | Number of respondents | Total burden |
| Annual hours burden | 200 hours | 449 | 89,800 hours. |
| Annual costs | $0 | 449 | $0. |

TERMINATION OF ORIGINAL SWAPS

[Increased by 50% from 60 day notice]

| Affected entities | DCOs | | |
|---|---|---|---|
| Burden type | Burden per respondent | Number of respondents | Total burden |
| One-time hours burden | 4,500 hours | 12 | 54,000 hours. |
| Annual costs | $375,000 | 12 | $4,500,000. |

**Increases in Hours Burdens and New Total Hours Burden**

Based on an increase in annual burden hours of 89,800, Commission staff estimate that the revised aggreagate total annual time burden for the collection is 562,945 hours.

**Increases in Aggregate Costs**

There are three components to the aggregate increase in annual costs associated with this revision, (a) costs associated with changes to reporting systems, to be incurred by 449 entities; (b) annualized costs associated with establishing SDR connections by DCOs; and (c) costs associated with maintaining SDR connections by DCOs.

First, the Commission estimates that the costs associated with additional and amended PET fields will be $15,196 per entity (200 hours × $75.98 per hour).[4] The aggregate increase across all 449 reporting entities and SDRs for the additional and amended PET fields is therefore $6,823,004.

Second, the Commission estimates that DCO to SDR connections will require each DCO to incur a one-time start-up cost of $341,910 (4,500 hours x $75.98 per hour). The Commission estimates that DCOs will use these connections for 20 years, and therefore the annualized start-up cost for SDR connections will be $17,095 per DCO. Based on 12 DCOs, the aggregate annualized start-up cost for SDR connections will be $205,146.

Third, DCOs will incur an aggregate annual cost of $4,500,000 to maintain those SDR connections.

By combining these three components, the *aggregate increase* to annual costs associated with this collection will be $11,528,150.

**Total Aggregate Costs**

Commission staff estimate that the revised *aggregate total annual cost* for the collection is $99,462,062. The burden estimate represents the burden that SDRs, swap execution facilities (''SEFs''), designated contract markets (''DCMs''), DCOs, swap dealers (''SDs''), major swap participants (''MSPs''), and non-SD/MSP swap counterparties incur to operate and maintain swap recordkeeping and reporting systems to facilitate the recordkeeping and reporting of swaps.

*Respondents/Affected Entities:* SDRs, SEFs, DCMs, DCOs, SDs, MSPs, and non-SD/MSP swap counterparties.

*Estimated Number of Respondents:* 30,210.

*Estimated Total Annual Burden on Respondents:* 562,945 hours.

*Estimated Total Annual Cost:* $99,462,062.

*Frequency of Collection:* Ongoing.

(Authority: 44 U.S.C. 3501 *et seq.*)

Dated: October 21, 2016.

**Robert N. Sidman,**

*Deputy Secretary of the Commission.*

[FR Doc. 2016–25925 Filed 10–25–16; 8:45 am]

BILLING CODE 6351–01–P

[4] In calculating the cost figures associated with burden hours, the Commission estimated the appropriate wage rate based on salary information for the securities industry compiled by the Securities Industry and Financial Markets Association (''SIFMA''). Commission staff arrived at an hourly rate of $75.98 using figures from a weighted average of salaries and bonuses across different professions from the SIFMA Report on Management & Professional Earnings in the Securities Industry 2013, modified to account for an 1800-hour work-year and multiplied by 1.3 to account for overhead and other benefits. The Commission estimated appropriate wage rate is a weighted national average of salary and bonuses for professionals with the following titles (and their relative weight): ''programmer (senior)'' (30% weight); ''programmer'' (30%); ''compliance advisor (intermediate)'' (20%); ''systems analyst'' (10%), and ''assistant/associate general counsel'' (10%).

## BUREAU OF CONSUMER FINANCIAL PROTECTION

### Compliance Bulletin and Policy Guidance; 2016–02, Service Providers

**AGENCY:** Bureau of Consumer Financial Protection.

**ACTION:** Compliance bulletin and policy guidance.

**SUMMARY:** The Bureau is reissuing its guidance on service providers, formerly titled CFPB Bulletin 2012–03, Service Providers to clarify that the depth and formality of the risk management program for service providers may vary depending upon the service being performed—its size, scope, complexity, importance and potential for consumer harm—and the performance of the service provider in carrying out its activities in compliance with Federal consumer financial laws and regulations. This amendment is needed to clarify that supervised entities have flexibility and to allow appropriate risk management.

**DATES:** The Bureau released this Compliance Bulletin and Policy Guidance on its Web site on October 31, 2016.

**FOR FURTHER INFORMATION CONTACT:** Suzanne McQueen, Attorney Adviser, Office of Supervision Policy, 1700 G Street NW., 20552, 202–435–7439.

**SUPPLEMENTARY INFORMATION:**

**1. Compliance Bulletin and Policy Guidance 2016–02, Service Providers**

The Consumer Financial Protection Bureau (CFPB) expects supervised banks and nonbanks to oversee their business relationships with service providers in a manner that ensures compliance with Federal consumer financial law, which is designed to protect the interests of consumers and avoid consumer harm. The CFPB's exercise of its supervisory and enforcement authority will closely reflect this orientation and emphasis.

This Bulletin uses the following terms:

*Supervised banks and nonbanks* refers to the following entities supervised by the CFPB:

• Large insured depository institutions, large insured credit unions, and their affiliates (12 U.S.C. 5515); and

• Certain non-depository consumer financial services companies (12 U.S.C. 5514).

*Supervised service providers* refers to the following entities supervised by the CFPB:

• Service providers to supervised banks and nonbanks (12 U.S.C. 5515, 5514); and

• Service providers to a substantial number of small insured depository institutions or small insured credit unions (12 U.S.C. 5516).

*Service provider* is generally defined in section 1002(26) of the Dodd-Frank Act as ''any person that provides a material service to a covered person in connection with the offering or provision by such covered person of a consumer financial product or service.'' (12 U.S.C. 5481(26)). A service provider may or may not be affiliated with the person to which it provides services.

*Federal consumer financial law* is defined in section 1002(14) of the Dodd-Frank Act (12 U.S.C. 5481(14)).

*A. Service Provider Relationships*

The CFPB recognizes that the use of service providers is often an appropriate business decision for supervised banks and nonbanks. Supervised banks and nonbanks may outsource certain functions to service providers due to resource constraints, use service providers to develop and market additional products or services, or rely on expertise from service providers that would not otherwise be available without significant investment.

However, the mere fact that a supervised bank or nonbank enters into a business relationship with a service provider does not absolve the supervised bank or nonbank of responsibility for complying with Federal consumer financial law to avoid consumer harm. A service provider that is unfamiliar with the legal requirements applicable to the products or services being offered, or that does not make efforts to implement those requirements carefully and effectively, or that exhibits weak internal controls, can harm consumers and create potential liabilities for both the service provider and the entity with which it has a business relationship. Depending on the circumstances, legal responsibility may lie with the supervised bank or nonbank as well as with the supervised service provider.

*B. The CFPB's Supervisory Authority Over Service Providers*

Title X authorizes the CFPB to examine and obtain reports from supervised banks and nonbanks for compliance with Federal consumer financial law and for other related purposes and also to exercise its enforcement authority when violations of the law are identified. Title X also grants the CFPB supervisory and enforcement authority over supervised service providers, which includes the authority to examine the operations of service providers on site.[1] The CFPB will exercise the full extent of its supervision authority over supervised service providers, including its authority to examine for compliance with Title X's prohibition on unfair, deceptive, or abusive acts or practices. The CFPB will also exercise its enforcement authority against supervised service providers as appropriate.[2]

*C. The CFPB's Expectations*

The CFPB expects supervised banks and nonbanks to have an effective process for managing the risks of service provider relationships. The CFPB will apply these expectations consistently, regardless of whether it is a supervised bank or nonbank that has the relationship with a service provider.

The Bureau expects that the depth and formality of the entity's risk management program for service providers may vary depending upon the service being performed—its size, scope, complexity, importance and potential for consumer harm—and the performance of the service provider in carrying out its activities in compliance with Federal consumer financial laws and regulations. While due diligence does not provide a shield against liability for actions by the service provider, it could help reduce the risk that the service provider will commit violations for which the supervised bank or nonbank may be liable, as discussed above.

To limit the potential for statutory or regulatory violations and related consumer harm, supervised banks and nonbanks should take steps to ensure that their business arrangements with service providers do not present unwarranted risks to consumers. These steps should include, but are not limited to:

• Conducting thorough due diligence to verify that the service provider understands and is capable of complying with Federal consumer financial law;

• Requesting and reviewing the service provider's policies, procedures, internal controls, and training materials to ensure that the service provider conducts appropriate training and oversight of employees or agents that have consumer contact or compliance responsibilities;

• Including in the contract with the service provider clear expectations about compliance, as well as appropriate and enforceable consequences for violating any compliance-related responsibilities, including engaging in unfair, deceptive, or abusive acts or practices;

• Establishing internal controls and on-going monitoring to determine whether the service provider is complying with Federal consumer financial law; and

• Taking prompt action to address fully any problems identified through the monitoring process, including terminating the relationship where appropriate.

For more information pertaining to the responsibilities of a supervised bank or nonbank that has business arrangements with service providers, please review the CFPB's *Supervision and Examination Manual: Compliance Management Review* and *Unfair, Deceptive, and Abusive Acts or Practices.*[3]

**2. Regulatory Requirements**

This Compliance Bulletin and Policy Guidance is a non-binding general statement of policy articulating considerations relevant to the Bureau's exercise of its supervisory and enforcement authority. It is therefore exempt from notice and comment

[1] *See, e.g.,* subsections 1024(e), 1025(d), and 1026(e), and sections 1053 and 1054 of the Dodd-Frank Act, 12 U.S.C. 5514(e), 5515(d), 5516(e), 5563, and 5564.

[2] *See* 12 U.S.C. 5531(a), 5536.

[3] *http://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf* at 34 (Compliance Management Review) and 174 (Unfair, Deceptive, and Abusive Acts or Practices).

rulemaking requirements under the Administrative Procedure Act pursuant to 5 U.S.C. 553(b). Because no notice of proposed rulemaking is required, the Regulatory Flexibility Act does not require an initial or final regulatory flexibility analysis. 5 U.S.C. 603(a), 604(a). The Bureau has determined that this Compliance Bulletin and Policy Guidance does not impose any new or revise any existing recordkeeping, reporting, or disclosure requirements on covered entities or members of the public that would be collections of information requiring OMB approval under the Paperwork Reduction Act, 44 U.S.C. 3501, *et seq.*

Dated: October 19, 2016.

**Richard Cordray,**

*Director, Bureau of Consumer Financial Protection.*

[FR Doc. 2016–25856 Filed 10–25–16; 8:45 am]

BILLING CODE 4810–AM–P

## DEPARTMENT OF DEFENSE

### Office of the Secretary

**[Docket ID DOD–2014–OS–0074]**

### Submission for OMB Review; Comment Request

**ACTION:** Notice.

**SUMMARY:** The Department of Defense has submitted to OMB for clearance, the following proposal for collection of information under the provisions of the Paperwork Reduction Act.

**DATES:** Consideration will be given to all comments received by November 25, 2016.

**FOR FURTHER INFORMATION CONTACT:** Fred Licari, 571–372–0493.

**SUPPLEMENTARY INFORMATION:**

*Title, Associated Form and OMB Number:* Application for Trusteeship, DD Form 2827, OMB License 0730–0013.

*Type of Request:* Reinstatement, without change, of a previously approved collection for which approval has expired.

*Number of Respondents:* 75.

*Responses per Respondent:* 1.

*Annual Responses:* 75.

*Average Burden per Response:* 15 minutes.

*Annual Burden Hours:* 19 hours.

*Needs and Uses:* The information collection is needed to identify the prospective trustees for active duty military and retirees. The information is required in order for the Defense Finance and Accounting Service (DFAS) to make payments on behalf of incompetent military members or retirees. DFAS is representing all services as the functional proponent for Retired and Annuitant Pay.

*Affected Public:* Individuals or households.

*Frequency:* On occasion.

*Respondent's Obligation:* Required to obtain or maintain benefits.

*OMB Desk Officer:* Ms. Jasmeet Seehra.

Comments and recommendations on the proposed information collection should be emailed to Ms. Jasmeet Seehra, DoD Desk Officer, at *Oira_submission@omb.eop.gov.* Please identify the proposed information collection by DoD Desk Officer and the Docket ID number and title of the information collection.

You may also submit comments and recommendations, identified by Docket ID number and title, by the following method:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments.

*Instructions:* All submissions received must include the agency name, Docket ID number and title for this **Federal Register** document. The general policy for comments and other submissions from members of the public is to make these submissions available for public viewing on the Internet at *http://www.regulations.gov* as they are received without change, including any personal identifiers or contact information.

*DOD Clearance Officer:* Mr. Frederick Licari.

Written requests for copies of the information collection proposal should be sent to Mr. Licari at WHS/ESD Directives Division, 4800 Mark Center Drive, East Tower, Suite 03F09, Alexandria, VA 22350–3100.

Dated: October 21, 2016.

**Aaron Siegel,**

*Alternate OSD Federal Register Liaison Officer, Department of Defense.*

[FR Doc. 2016–25897 Filed 10–25–16; 8:45 am]

BILLING CODE 5001–06–P

## DEPARTMENT OF DEFENSE

### Department of the Navy

**[Docket ID: USN–2014–0012]**

### Submission for OMB Review; Comment Request

**ACTION:** Notice.

**SUMMARY:** The Department of Defense has submitted to OMB for clearance, the following proposal for collection of information under the provisions of the Paperwork Reduction Act.

**DATES:** Consideration will be given to all comments received by November 25, 2016.

**FOR FURTHER INFORMATION CONTACT:** Fred Licari, 571–372–0493.

**SUPPLEMENTARY INFORMATION:**

*Title, Associated Form and OMB Number:* Application Forms and Information Guide, Naval Reserve Officers Training Corps (NROTC) Scholarship Program; OMB Control Number 0703–0026.

*Type of Request:* Reinstatement, with change, of a previously approved collection for which approval has expired.

*Number of Respondents:* 14,000.

*Responses per Respondent:* 7.

*Annual Responses:* 98,000.

*Average Burden per Response:* 3 hours 30 minutes.

*Annual Burden Hours:* 46,666.

*Needs and Uses:* This collection of information is used to make a determination of an applicant's academic and/or leadership potential and eligibility for an NROTC scholarship. The information collected is used to select the best-qualified candidates.

*Affected Public:* Individuals or Households.

*Frequency:* Annually.

*Respondent's Obligation:* Required to obtain or retain benefits.

*OMB Desk Officer:* Ms. Jasmeet Seehra.

Comments and recommendations on the proposed information collection should be emailed to Ms. Jasmeet Seehra, DoD Desk Officer, at *Oira_submission@omb.eop.gov.* Please identify the proposed information collection by DoD Desk Officer and the Docket ID number and title of the information collection.

You may also submit comments and recommendations, identified by Docket ID number and title, by the following method:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments.

*Instructions:* All submissions received must include the agency name, Docket ID number and title for this **Federal Register** document. The general policy for comments and other submissions from members of the public is to make these submissions available for public viewing on the Internet at *http://www.regulations.gov* as they are received without change, including any personal identifiers or contact information.

*DOD Clearance Officer:* Mr. Frederick Licari.